EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* NÉSTOR L. SANTIAGO FELICIANO, demandado y recurrido.

*Número:* CE-93-189 *Resuelto:* 9 de noviembre de 1995

374

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

La Ley Núm. 36 de 19 de junio de 1987 enmendó la Ley Contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico, Ley Núm. 33 de 13 de julio de 1978, según enmendada, 25 L.P.R.A. sec. 971 *et seq.*, con el propósito de modernizar las investigaciones criminales relacionadas al crimen organizado. En la Exposición de Motivos de la referida ley enmendatoria, la Asamblea Legislativa expuso su preocupación de la manera siguiente:

> Las actividades criminales relacionadas con el crimen organizado en Puerto Rico han ido en aumento y su sofisticación ha rebasado las limitaciones de los métodos investigativos del Estado. Gran parte de la incidencia criminal en el país está relacionada directa o indirectamente con el crimen organizado.
>
> . . . . . . . .
>
> Por otro lado, la sofisticación del planteamiento y operación de estas organizaciones criminales requiere del Estado nuevos y también sofisticados mecanismos investigativos que le permita tener acceso a las personas envueltas o que participan en dichas organizaciones criminales. De esta manera se podrá desarticular el crimen organizado en Puerto Rico. Por lo que ante

el poder y recursos con que cuentan las organizaciones criminales en Puerto Rico, es necesario enmendar la Ley del Crimen Organizado para adaptarla a las realidades actuales. 1987 Leyes de Puerto Rico 128–129.

Nos toca determinar la constitucionalidad de la Sec. 6 de la referida Ley Núm. 36 (25 L.P.R.A. sec. 971q), la cual autoriza la grabación de las conversaciones no telefónicas durante la investigación del crimen organizado.

I

A. *La ley*

La Sec. 6 de la Ley Núm. 36, *supra*, añadió el Art. 18 a la Ley Contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico (en adelante Ley Contra el Crimen Organizado) para facultar al Secretario de Justicia a solicitar una orden judicial para grabar una comunicación oral no telefónica "cuando tenga motivo fundado de que una persona se dedica o está envuelta en un patrón de actividad del crimen organizado" y la comunicación que se interese grabar esté relacionada al crimen organizado. 25 L.P.R.A. sec. 971q. La ley define una "actividad del crimen organizado" como

> ... cualquier acto o amenaza relacionado a asesinato, secuestro, juegos ilegales, leyes relativas a la prostitución, incendio, apropiación ilegal, robo, obscenidad, soborno, extorsión, o la venta, posesión y transportación de sustancias controladas o armas, sujeto a acusación criminal bajo las leyes del Estado Libre Asociado o las leyes de los Estados Unidos de América. 25 L.P.R.A. sec. 971a(b).

Un "patrón" de actividad del crimen organizado requiere que se hayan cometido por lo menos dos (2) actos de los antes mencionados, dentro de un período de diez (10) años, sin contar ningún período durante el cual el sospechoso haya estado recluido. 25 L.P.R.A. sec. 971a(i).

■ Por otro lado, la ley claramente prohíbe que se graben conversaciones relacionadas con actividades políticas o de cualquier otra naturaleza que no sea del crimen organizado. 25 L.P.R.A. sec. 971q(b).

■ Además de unos requisitos específicos que establece la ley respecto de la solicitud y expedición de la orden judicial para grabar, los cuales discutiremos más adelante, la ley provee que la orden estará sujeta a que

[l]a grabación sea realizada únicamente por un investigador o persona privada que actúe como informante o agente encubierto siempre y cuando esté debidamente autorizado para ello por el investigador, *cuando tal investigador o persona privada sea una parte de la comunicación, o cuando cualquier persona que participe en la comunicación haya dado su consentimiento previo a tal grabación.* (Énfasis suplido.) 25 L.P.R.A. 971q(a).

■ La grabación puede efectuarse a través de un mecanismo de grabación que registre directamente la comunicación o por medio de un mecanismo que trasmita la comunicación a otro lugar donde será grabada. 25 L.P.R.A. sec. 971a(j).

■ La ley establece, además, unas situaciones extraordinarias en las cuales, por vía de excepción, se faculta al Secretario de Justicia a autorizar la grabación sin una orden judicial previa, siempre y cuando se someta la solicitud correspondiente al tribunal dentro de las veinticuatro (24) horas siguientes a la grabación. 25 L.P.R.A. sec. 971q(c). En estos casos, la ley claramente establece que la grabación así obtenida no podrá ser admitida como evidencia si no se obtiene la orden correspondiente dentro de las veinticuatro (24) horas siguientes, ya sea porque la solicitud correspondiente no fue sometida como lo requiere la ley o porque, habiendo sido sometida, ésta fuese denegada.

## B. *Los hechos*

El 4 de septiembre de 1989, Néstor Santiago Feliciano fue asignado al cargo de Fiscal Auxiliar del Tribunal de Distrito, en la División de Drogas de la Oficina de Investigaciones y Procesamiento Criminal, con sede en la Fiscalía de Ponce. Desde el 11 de enero de 1991, desempeñó el referido cargo en el Tribunal Superior.

El 5 de junio de 1991 se presentaron dos (2) denuncias contra Santiago Feliciano por el delito de soborno agravado, Art. 210 del Código Penal, 33 L.P.R.A. sec. 4361, y otra por violación al Art. 3(c) de la Ley Contra el Crimen Organizado, 25 L.P.R.A. sec. 971b(c).([1]) Comenzada la vista preliminar, Santiago Feliciano renunció a ella y se allanó a que se le determinara causa probable por los delitos imputados en las denuncias. El 23 de octubre de 1991, el Ministerio Público presentó unas acusaciones contra Santiago Feliciano por dos (2) cargos de soborno agravado, consistentes en que siendo Fiscal del Departamento de Justicia recibió dinero a cambio de ejercer influencia para favorecer a unas personas que iban a o debían ser procesadas criminalmente, y siete (7) cargos por infracciones a la Ley Contra el Crimen Organizado, consistentes en su participación en una empresa criminal organizada o un "patrón" de actividades de crimen organizado.

Los dos (2) cargos presentados por el delito de soborno agravado disponen, en lo pertinente, como sigue:

 ... Santiago Feliciano ... actuando en concierto y común

---

([1]) Este artículo dispone que:

"Será ilegal que una persona empleada por o asociada a cualquier empresa o negocio, participe, directa o indirectamente, en la dirección de los asuntos de dicha empresa a través de un patrón de actividad de crimen organizado o mediante la recaudación de una deuda ilegal." 25 L.P.R.A. sec. 971b(c).

"Empresa o negocio" es un término amplio que incluye

"... cualquier sociedad, corporación, asociación u otra entidad legal, y cualquier unión o grupo de individuos asociados, aunque no constituyan una sociedad legal, exceptuando aquellos que se asocien primordialmente para fines sociales, familiares o políticos." 25 L.P.R.A. sec. 971a(f).

acuerdo con el Sr. Adalberto Rosas Santapao, siendo un funcio-
nario o empleado público, Fiscal Auxiliar del Departamento de
Justicia de P.R., solicitó y recibió dinero por la cantidad de
$14,000.00 de parte del Señor Carlos Pagán San Miguel, con el
entendido o la inteligencia de que tal renumeración [sic] habría
de alegadamente influenciar en las Autoridades Federales para
que éstos no confiscaran unas propiedades del Sr. Carlos Pagan
San Miguel, o de sus familiares, ya que existía un caso pen-
diente de drogas en el Tribunal de Mayagüez, que es un acto
regular de sus funciones como funcionario del Departamento de
Justicia de P.R.

. . . . . . . . .

...solicitó la suma de $6,000.00, de los cuales recibió un ade-
lanto por la suma de $2,000.00 de parte del Sr. Héctor Franqui
Gelabert, por omitir o retardar e influenciar en que se evitare
radicar unas alegadas acusaciones contra el Sr. Franqui Gela-
bert, el hijo de éste y el Sr. Carlos Acosta Vélez, que es un acto
regular de sus funciones y en el cumplimiento de sus deberes
como funcionario del Departamento de Justicia de Puerto Rico.

Surge del alegato del acusado que los actos de soborno
relacionados a Franqui Gelabert, su hijo y Acosta Vélez
alegadamente se refieren a la investigación, que se estaba
llevando a cabo, de la muerte del Sr. Carlos Casiano Za-
pata ocurrida el 27 de febrero de 1991 en la residencia de
Franqui Gelabert en Cabo Rojo.

La acusación por infracción al Art. 3(c) de la Ley Contra
el Crimen Organizado, *supra*, contiene siete (7) cargos, los
cuales describen, en esencia, los actos de conspiración, so-
licitación y demás pasos necesarios para llevar a cabo los
actos de soborno agravado descritos anteriormente.

Parte esencial de la prueba de cargo en estos casos con-
sistió de la grabación de una conversación entre el acusado
y Rosas Santapao, obtenida con el consentimiento y la co-
operación de este último y mediante una orden judicial, en
conformidad con la Sec. 6 de la Ley Núm. 36, *supra*.

Luego de varios trámites procesales,([2]) el 18 de agosto

---

([2]) Entre ellos, el 27 de abril de 1992, el acusado solicitó la desestimación de los
pliegos acusatorios presentados en su contra por entender que, a base de los hechos
descritos en éstos, no se le debió haber imputado el delito de soborno agravado sino
el de influencia indebida. Esta solicitud fue denegada posteriormente por el foro

de 1992 el acusado solicitó la supresión de la grabación aludida. En su solicitud planteó que la grabación de conversaciones orales es inconstitucional porque viola el derecho a la intimidad de todo ciudadano y su derecho a no autoincriminarse; que el esquema establecido en la Ley Núm. 36, *supra*, para la obtención de la orden judicial y la custodia de las grabaciones por parte del tribunal viola el principio de la separación de poderes, y, en la alternativa, que procedía la supresión de la grabación porque se le había acusado por el delito equivocado con la intención ilícita de aprovecharse de la referida ley.

Luego de que el Ministerio Público se opusiera a la solicitud referida, el 27 de mayo de 1993 el tribunal de instancia declaró inconstitucional la Sec. 6 de la Ley Núm. 36, *supra*, y ordenó la supresión de la evidencia. El foro sentenciador resolvió, en síntesis, que la citada Sec. 6 de la Ley Núm. 36 (Art. 18 de la Ley Contra el Crimen Organizado) es inconstitucional "por estar en contravención con los principios constitucionales que garantizan la dignidad del ser humano y su derecho a la intimidad" y que el "esquema contemplado en el mismo viola el principio de separación de poderes".[3]

---

sentenciador, el cual resolvió que habiéndose allanado el acusado a que se determinara causa probable en su contra por los delitos imputados, cualquier enmienda al pliego acusatorio podría ventilarse al comienzo del juicio.

[3] Surge de la pág. 50 de la resolución recurrida que el tribunal a quo entendió que la "norma de análisis constitucional" que aplicaba a la controversia del caso de marras era la del escrutinio estricto, bajo la cual el Estado tenía que demostrar un interés apremiante que justificara la intervención con el derecho fundamental a la intimidad. A base de ello, determinó que no era necesario este tipo de mecanismo para combatir el crimen, porque la orden judicial se podía obtener únicamente en casos en que hubiese un patrón recurrente de conducta delictiva y que, como además requería que el agente tuviese conocimiento de cuándo se iba a llevar a cabo nuevamente la conducta delictiva, éste podía utilizar otros medios menos onerosos para detener la comisión del crimen antes de que se perpetrase. Resolvió, además, que el propósito fundamental de la ley era establecer la veracidad de los agentes encubiertos y que ello estaba motivado por la creciente desconfianza del pueblo en el Ministerio Público durante la década de los '80, por la ocurrencia de abusos y falsificaciones en manos de los agentes encubiertos y los fiscales en casos como el del Cerro Maravilla y en relación con la creación ilegal de "carpetas". A base de ello, determinó que el mecanismo dispuesto en la ley no correspondía a este interés porque lo único que lograba era poner métodos aún más invasivos en manos de los funcionarios

El Procurador General recurrió oportunamente ante nos mediante una Petición de *certiorari* y planteó los señalamientos de error siguientes: .

1. Erró el Tribunal Superior al resolver que la Ley 36 de 19 de junio de 1987, en cuanto provee para la autorización judicial de grabaciones de conversaciones no telefónicas, es inconstitucional por estar reñida con los principios constitucionales que garantizan la dignidad del ser humano y su derecho a la intimidad.

2. Erró el Tribunal Superior al resolver que la Ley 36 de 19 de junio de 1987, en cuanto provee para la autorización judicial de grabaciones de conversaciones no telefónicas, es inconstitucional por estar reñida con el principio de separación de poderes.

3. Erró el Tribunal Superior al no aplicar la doctrina de "buena fe".

El 7 de junio de 1993 expedimos el auto de *certiorari*. Luego de varias prórrogas concedidas a ambas partes, el Procurador General presentó su alegato el 8 de septiembre de 1993, y el acusado el 17 de marzo de 1994. Pasamos a resolver.

## II

La Sec. 8 de la Carta de Derechos (Art. II) de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 292, dispone que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o

---

públicos potencialmente corruptos. Finalmente, resolvió que el Estado no había cumplido con su obligación de demostrar que no existían métodos menos drásticos para obtener este tipo de evidencia.

La norma aplicada por el Tribunal de Instancia es claramente errónea. La "norma del escrutinio estricto" se refiere al tipo de escrutinio judicial —ya sea estricto o tradicional— que se utiliza para examinar la razonabilidad de las clasificaciones en aquellos casos en que se alegue una violación al principio constitucional de la igual protección de las leyes. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992). Atendemos, pues, la controversia del caso ante nos de acuerdo con las normas de la expectativa razonable de intimidad y la protección contenida en las Secs. 8 y 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1.

familiar". Esta sección, junto con el principio de inviolabilidad de la dignidad del ser humano, que está contenido en la primera sección del referido artículo, son la fuente en nuestro ordenamiento jurídico del derecho a la intimidad, derecho fundamental que goza de la más alta jerarquía en nuestro entramado de derechos constitucionales. *Pueblo v. De León Martínez*, 132 D.P.R. 746 (1993); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 59–62 (1986); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 340 (1983); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975).

No obstante el lugar privilegiado que este derecho tiene dentro de nuestro ordenamiento jurídico sobre otros constitucionalmente reconocidos, reiteradamente hemos establecido que el derecho a la intimidad puede ser invocado únicamente por aquella persona que, dentro de las circunstancias particulares del caso, *tenga una expectativa real de que su intimidad se respete* y que la sociedad esté dispuesta a reconocer esa expectativa como legítima o razonable. *Pueblo en interés menor N.R.O.*, 136 D.P.R. 949 (1994); *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994); *Pueblo v. De León Martínez*, supra; *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992); *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984); *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394 (1983); *Pueblo v. Luzón*, 113 D.P.R. 315 (1982); *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979). Por lo tanto, en casos como el de autos, en que la solicitud de supresión de evidencia está fundamentada en que la prueba ha sido obtenida en violación al derecho a la intimidad, el promovente está obligado a establecer que tiene una expectativa razonable a la intimidad respecto de lo que intenta

suprimir. De lo contrario, el acusado no puede reclamar la protección del derecho de intimidad.[4]

■ Por otro lado, el derecho así reconocido no es absoluto, especialmente en relación con el interés fundamental que tiene el Estado en poner en vigor las leyes penales del país y el interés colectivo de combatir la criminalidad. *Pueblo v. Muñoz, Colón y Ocasio*, supra; *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988); *Pueblo v. Pérez Pérez*, 115 D.P.R. 827 (1984); *Pueblo v. Lebrón*, supra. Las Secs. 8 y 10 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, limitan lo que puede hacer el Estado para imponer el orden sin violar el derecho de los ciudadanos a la intimidad, pero no prohíben de manera absoluta la intromisión del Estado en la vida privada de un individuo cuando ésta sea necesaria como resultado de una investigación o un procedimiento criminal. Informe de la Comisión de la Carta de Derechos, 4 Diario de Sesiones de la Convención Constituyente 2567–2568 (1961).

■ Del propio texto de las secciones referidas surge claramente que, excepto por la prohibición específica contenida en la Sec. 10 sobre la interceptación de comunicaciones telefónicas, lo que la Constitución provee a las personas, como regla general, es la garantía de que su intimidad estará protegida contra "ataques *abusivos*" y "registros, incautaciones y allanamientos *irrazonables*". Const. E.L.A., *supra*, ed. 1982, pág. 299. Es decir, que la protección que garantiza la Constitución no es contra la intromisión del Estado per se, sino contra la que sea abu-

---

[4] Por ejemplo, en ocasiones anteriores hemos resuelto que no existe expectativa de intimidad sobre evidencia que se encuentra a plena vista, *Pueblo v. Dolce*, 105 D.P.R. 422 (1976); cuando la evidencia es arrojada o abandonada, *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979); cuando la evidencia es obtenida en el transcurso de una persecución, *Pueblo v. Riscard*, 95 D.P.R. 405 (1967); cuando la evidencia es obtenida en un registro administrativo de una actividad altamente regulada por el Estado, *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984), y cuando ha mediado consentimiento para el registro, *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986). En estos casos no se puede invocar el derecho a la intimidad para solicitar la supresión de evidencia.

siva o irrazonable. E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, pág. 279.

El alcance de estas garantías debe ser interpretado primordialmente a la luz de lo establecido en nuestra Constitución y en nuestra jurisprudencia.([5]) Sin embargo, puesto que estamos compelidos a interpretar los preceptos constitucionales sobre el derecho a la intimidad en armonía con el contenido mínimo requerido bajo la protección de la Cuarta Enmienda de la Constitución de Estados Unidos —aplicable a los estados bajo la Decimocuarta Enmienda— y la correspondiente interpretación adoptada por el Tribunal Supremo federal,([6]) pasamos en primer lugar a exponer brevemente la norma federal aplicable a casos como el que tenemos ante nos ahora.

## III

La Cuarta Enmienda de la Constitución de Estados Unidos establece que "[n]o se violará el derecho del pueblo a la seguridad de las personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables". Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 186. La protección de la Cuarta Enmienda cubre no sólo la incautación de cosas u objetos tangibles, sino también la grabación de declaraciones orales. *Silverman v. United States*, 365 U.S. 505, 511 (1961); *Katz v. United States*, 389 U.S. 347, 353 (1967).

---

([5]) El historial y desarrollo jurisprudencial del derecho a la intimidad en nuestra jurisdicción es distinto al de la jurisdicción federal porque: (1) adquirió un rango constitucional en Puerto Rico más temprano que en la jurisdicción federal; (2) se formuló con el propósito de que tuviera una factura más ancha que el derecho reconocido en otras culturas, y (3) debe interpretarse de manera fiel a nuestra identidad y cultura, en armonía con su reconocimiento federal e internacional. *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 52–62 (1986); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 258–263 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 439–440 (1975).

([6]) *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992); *Pueblo v. Dolce*, supra; *Cooper v. California*, 386 U.S. 58 (1967).

En *Katz v. United States*, supra, el Tribunal Supremo federal tuvo la oportunidad de examinar la validez constitucional de la utilización de un detector electrónico colocado en la parte exterior de una cabina telefónica para escuchar la parte de la conversación telefónica del individuo que se encontraba dentro de la cabina. Allí, el máximo Foro federal resolvió que la determinación de si ha ocurrido un registro o allanamiento depende de que quien invoque la protección de la Cuarta Enmienda tenga una expectativa razonable de intimidad (*reasonable expectation of privacy*), y que como el individuo afectado en ese caso tenía una legítima expectativa de intimidad sobre lo conversado dentro de la cabina telefónica, el Estado no podía escuchar la conversación por medios electrónicos sin una orden judicial previa. *Katz v. United States*, supra, págs. 353–355.([7]) Posteriormente, en *Smith v. Maryland*, 442 U.S. 735 (1979), el máximo Foro federal explicó que quien invoque el derecho a la protección de su intimidad tiene que establecer no sólo que tenía una expectativa real de intimidad en las circunstancias específicas de su caso (criterio subjetivo), sino, además, que esa expectativa era de tal naturaleza que la sociedad reconocía ésta como razonable (criterio objetivo). A la luz de esta doctrina, el Tribunal Supremo federal ha resuelto que, como regla general, la utilización de diversos aparatos electrónicos en la investigación criminal está sujeta a la protección contra registros y allanamientos irra-

---

([7]) La doctrina jurisprudencial federal que existía antes de la opinión en el caso *Katz v. United States*, 389 U.S. 347 (1967), era que para que ocurriera una incautación en violación de la Cuarta Enmienda, ésta tenía que ser el resultado de una invasión física o penetración (*trespass*) de un área protegida. A base de esta doctrina, el Tribunal Supremo federal había resuelto en el caso *Goldman v. United States*, 316 U.S. 129 (1942), que escuchar una conversación dentro de una habitación por medio de un detector de pared no violaba la Cuarta Enmienda porque no había ocurrido una invasión física del lugar donde se estaba llevando a cabo la conversación. Por el contrario, si el mecanismo utilizado traspasaba la pared e invadía el lugar donde se estaba llevando a cabo la conversación, ocurría entonces una penetración del lugar que activaba la protección de la Cuarta Enmienda, *Silverman v. United States*, 365 U.S. 505 (1961), excepto que hubiese mediado el consentimiento de uno de los participantes en la conversación, *On Lee v. United States*, 343 U.S. 747 (1952). Esta norma fue alterada por la decisión en el caso *Katz v. United States*, supra.

zonables de la Cuarta Enmienda, en la medida en que el mecanismo utilizado represente una "intromisión" indebida con la expectativa razonable de intimidad de un individuo. *United States v. Karo*, 468 U.S. 705, 716–717 (1984); *United States v. Knotts*, 460 U.S. 276 (1983).

Aplicando esta doctrina, el Tribunal Supremo federal ha resuelto, además, que la grabación de conversaciones orales a través de agentes encubiertos o informantes que porten equipo de trasmisión o grabación electrónica, no requiere una autorización judicial, siempre y cuando la persona que sea objeto de la investigación sea consciente de la presencia del agente o informante en el lugar, aun cuando no conozca su identidad o su intención de grabar la conversación. Véanse: *United States v. Cáceres*, 440 U.S. 741 (1979); *United States v. White*, 401 U.S. 745 (1970); *On Lee v. United States*, 343 U.S. 747 (1952); *Hoffa v. United States*, 385 U.S. 293 (1966); *Lopez v. United States*, 373 U.S. 427 (1963).[8] Al así resolver, dicho foro ha afirmado que una persona que equivocadamente confíe en otra, quien resulta ser un informante de la Policía o un agente encubierto, no posee una expectativa razonable de intimidad merecedora de protección respecto de las declaraciones incriminatorias así confiadas, puesto que la Cuarta Enmienda no le ofrece una garantía al delincuente de que no será delatado por aquel a quien le haya confiado la fechoría. El Tribunal Supremo federal ha resuelto, además, que dicho análisis se extiende forzosamente a la evidencia que se pueda obtener a través de grabaciones o trasmisiones electrónicas, porque las grabaciones son meramente prueba corroborativa de la conversación. Como no existe una expectativa razonable separada que impida que un delator pueda contarle a la Policía el contenido específico de una conversación incriminatoria inmediatamente después

---

[8] Véanse, además: W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. I, Secs. 2.1-2.4; J. Wesley Hall, *Search and Seizure*, 2da ed., Illinois, Ed. Clark Boardman Callaghan, 1993, Cap. 33; 68 Am.Jur.2d Secs. 234–353, págs. 842–941 (1993).

de que ésta haya ocurrido, o tomar notas detalladas de todo lo acaecido, tampoco debe haberla respecto a un método más preciso y confiable. En *United States v. White,* supra, págs. 751–753, el Tribunal Supremo federal resumió el criterio aplicable de la manera siguiente:

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* 385 U.S., at 300–303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez* v. *United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States, supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.
>
> Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. ... Our problem, in terms of the principles announced in *Katz,* is what expectations of privacy are constitutionally "justifiable" —what expectations the Fourth Amendment will protect in the absence of a warrant. ... If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when the same agent has recorded or transmitted the conversations which are later offered in evidence...
>
> ... If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. ... At least there is no persuasive evidence that the difference in this

respect between the electronically equipped agent and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of "reasonableness".[9]

En resumen, pues, la jurisprudencia federal no exige que se cumpla con los requisitos de la Cuarta Enmienda cuando es uno de los participantes en la conversación quien la graba o consiente a ello.[10] Véase *Pueblo v. De León Martínez*, supra. Esta es la situación del caso de autos.

## IV

■ A. Como señalamos anteriormente, en nuestra jurisdicción, al igual que en el ámbito federal, el derecho a la intimidad existe únicamente en aquellos casos en los cuales quien lo invoque tenga una expectativa razonable de intimidad. En Puerto Rico, como regla general, la expectativa de intimidad que un individuo pueda tener en circunstancias relacionadas directamente con la comisión de un acto criminal es *limitada*. Así lo determinaron quienes redactaron nuestra Constitución. La Comisión de la Carta de Derechos de la Constituyente explicó el alcance de la Sec. 10 de la manera siguiente:

La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano son como una prolongación de su persona, pues constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda

[9] Cabe señalar que la opinión en el caso *United States v. White*, 401 U.S. 745 (1971), reseñada en el texto fue de pluralidad en la cual cuatro de los jueces que emitieron votos separados —el Juez Brennan (concurrente) y los Jueces Douglas, Harlan y Marshall (disidentes)— todos estuvieron esencialmente de acuerdo en que la grabación mediante una orden judicial cumpliría con las exigencias de la Cuarta Enmienda.

[10] *Cf.*, Título 3 del *Omnibus Crime Control and Safe Streets Act*, 18 U.S.C. secs. 2511–2519 (requisito de orden judicial previa para grabar las conversaciones orales o telefónicas en investigaciones federales cuando *ninguno* de los participantes en la conversación haya consentido a ello).

intromision sin su permiso en este círculo privado equivale para todo hombre a una violación de su personalidad. Lo mismo acontece con los medios en que expresa su intimidad y que reserva tan sólo para algunos: su correspondencia, sus manifestaciones espontáneas a través de los modernos medios mecánicos de comunicación. La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona.

Sin embargo, los mismos medios y propiedades que sirven para el desarrollo y el sostén de la persona pueden ser instrumento de delito o resultado de su comisión. *En estos casos detenerse ante esas fronteras de la personalidad equivaldría a la protección indebida del delito y del delincuente.* En esta colisión de lo privado y lo público, la solución se entrega, con todas las garantías, a la autoridad judicial encargada de perseguir y sancionar las transgresiones de la ley. *Las garantías personales frente al arresto, el registro, la incautación y el allanamiento tienen su límite en la conducta criminal.* (Énfasis suplido.) Diario de Sesiones, *supra*, págs. 2567–2568.

En *P.R. Tel. Co. v. Martínez*, supra, en ocasión de examinar el alcance de la prohibición constitucional de la interceptación de una conversación telefónica, resolvimos que aunque se debe proteger la expectativa de intimidad de personas que *bona fide* se identifiquen o sean identificables por quien reciba, la llamada, el autor de una llamada ilegal que atenta contra la intimidad de quien la recibe no es merecedor de que se obtenga su consentimiento previo como requisito para interceptar su llamada, puesto que de su conducta ilegal "se deriva e infiere, por imperativo circunstancial, una renuncia clara al derecho". Íd., pág. 345.

De igual manera, no puede existir una expectativa legítima o razonable de intimidad sobre el *contenido* de una conversación relacionada a *la comisión de un crimen.*([11]) La clandestinidad que normalmente caracteriza

---

([11]) En nuestra jurisdicción *estatutariamente* se ha reconocido como delito la grabación de una "comunicación privada personal" (oral o telefónica) sin el consentimiento previo de todos los participantes en la conversación. Art. 145 del Código Penal, 33 L.P.R.A. sec. 4186. En ocasión de interpretar el alcance del término "comunicación privada personal" para efectos del referido artículo, dijimos que la disposi-

tal actividad no es un interés protegido por el derecho a la intimidad. Éste no legitimiza la expectativa subjetiva del delincuente de mantenerla oculta. Respecto de estas conversaciones, lo que nuestra sociedad reconoce como razonable, lo que favorece, no es la protección de éstas sino, más bien, su divulgación, por el preeminente interés colectivo que existe respecto a combatir el crimen, y, en el caso particular de autos, por el preeminente interés colectivo adicional de ernadicar el fraude en la función pública. Por eso las declaraciones voluntarias incriminatorias hechas a otros son incuestionablemente admisibles en evidencia en un procedimiento criminal, sujeto a las Reglas de Evidencia aplicables, sin necesidad de una orden judicial. Independientemente de la existencia de una grabación, los agentes encubiertos, los informantes y otras personas que hayan participado en una conversación de carácter incriminatorio pueden legítimamente testificar sobre su contenido en un juicio criminal. Regla 62 de Evidencia, 32 L.P.R.A. Ap. IV (admisiones).

Y, claro está, si la conversación incriminatoria no está protegida, tampoco lo está su grabación como tal. En *Pueblo v. Luzón*, supra, reconocimos el valor probatorio de unas cintas de *video tapes* y una fotografía que fueron tomadas a los acusados en áreas abiertas al público del hotel Caribe Hilton y otros espacios abiertos, como evidencia de tipo corroborativo. Allí citamos con aprobación la norma de *United States v. White*, supra, a los efectos de que,

---

ción protege únicamente a los participantes que tengan una expectativa legítima de que lo comunicado quedaría entre ellos, es decir, una expectativa de intimidad subjetiva sobre el *contenido* de la conversación. Este derecho estatutariamente reconocido responde al interés público que existe respecto de la "inviolabilidad del círculo privado que constituye una prolongación de la persona". *Pueblo v. De León Martínez*, 132 D.P.R. 746, 758 (1993). Sin embargo, no podemos extender igual protección a conversaciones relacionadas a *actividades criminales*. En *Pueblo v. De León Martínez*, supra, reconocimos la sabiduría de la prohibición estatutaria para proteger aquellas conversaciones que fueran parte del "contorno privado" de una persona, en relación con materias que incidieran sobre la vida privada o familiar del ser humano. Se sobreentendía que nos referíamos a conversaciones sobre asuntos legítimos. Evidentemente la situación es distinta y no merece igual protección cuando la actividad es puramente criminal.

... para propósitos constitucionales, se obtiene el mismo resultado si un agente prepara un informe y pone por escrito una conversación justo después de haberla sostenido con un acusado, o si se realiza el informe mediante la grabación o transmisión —con equipo electrónico que lleve consigo el agente— de dicha conversación. *Pueblo v. Luzón*, supra, pág. 325.

Resolvemos, pues, que el acusado en el caso ante nos no podía abrigar una expectativa legítima de intimidad sobre el contenido de la conversación incriminatoria grabada.

 Lo anterior no obstante, la utilización de un mecanismo de grabación directa de la conversación nos obliga a considerar la posibilidad de que el método investigativo utilizado capte declaraciones distintas a la interesada —del sospechoso o de terceros— las cuales pueden no estar relacionadas a la comisión de ningún crimen, sino que sean de carácter privado personal, protegidas por el derecho a la intimidad.

De la transcripción de una porción de la grabación que presentó el acusado como parte de su solicitud de supresión de evidencia, la cual obra en autos, surge que la grabadora que portaba el informante, Rosas Santapao, fue activada antes de que éste entrara en el edificio de la Fiscalía de Ponce y que grabó las conversaciones que Rosas Santapao tuvo con los empleados que saludó y a quienes les preguntó por el paradero de Santiago Feliciano, y con visitantes del edificio, quienes le solicitaron direcciones. La ley nada dispone sobre ésto y el Procurador General, en su alegato, nada dice sobre la posibilidad de utilizar métodos investigativos que eviten el problema.

En *P.R. Tel. Co. v. Martínez*, supra, encaramos una conjunción de hechos similar a la antes mencionada. Allí, como aquí, existía la posibilidad de que, al captar una llamada anónima ilegal, se interceptaran, además, otras conversaciones que no fuesen la interesada, sobre las cuales los participantes podían tener una expectativa legítima a la intimidad. Resolvimos en esa ocasión que sobre esas conversaciones "no podría mantenerse ni continuarse una

interceptación mediante ningún medio mecánico o análogo sin el consentimiento o renuncia de todas las partes que intervienen". Íd., pág. 347. Aunque reconocimos que el autor de la llamada anónima ilegal no era merecedor de la protección que ofrece la prohibición constitucional de interceptación de una comunicación telefónica, resolvimos que el método que se utilizara para tales casos tenía que estar diseñado de manera tal que se protegiera el derecho de los otros a que no se interceptaran sus llamadas telefónicas sin su consentimiento.([12])

En el caso ante nos ahora existe igualmente el peligro de que, junto con la interceptación de una conversación no protegida, se capta también una comunicación que sí esté cobijada por el derecho a la intimidad. Existe la posibilidad de que el sujeto a quien vaya dirigida la orden revele información adicional a la que se interesa, incluso información sobre su vida privada personal, que merezca proteción por encima de sus acciones criminales. Por ello, aunque resolvemos que respecto del contenido de una conversación criminal, como regla general, no existe una expectativa legítima de intimidad merecedora de la protección constitucional, en los casos como el de autos, en que se pretende grabar una conversación incriminatoria pero el método electrónico utilizado puede potencialmente grabar otras comunicaciones constitucionalmente protegidas, resolvemos que, como regla general, la grabación de las conversaciones no protegidas sólo puede hacerse de modo tal que quede debidamente salvaguardado el derecho a la intimidad que cobija las otras conversaciones protegidas que puedan resultar incidentalmente afectadas.([13])

---

([12]) Para cumplir con este requisito, se exigió que se separase la etapa de la llamada que corresponde a la identificación de la persona del contenido de la conversación, para efectos de la interceptación.

([13]) Como se señala más adelante, este derecho se salvaguarda mediante una orden judicial, fundada en causa probable, tal como dispone la ley en cuestión. *Cf.*, en general, E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.26, págs. 494–507; *Simposio sobre la graba-*

 De esta manera, reiteramos hoy el principio fundamental de que en una sociedad democrática como la nuestra, el derecho a la intimidad está fundamentado en la soberanía del individuo sobre su mente y el espacio inmediato que le rodea. Extender la protección al derecho a la intimidad a estas situaciones asegura, además, que la utilización de los mecanismos investigativos de la Ley Núm. 36, *supra*, no pueda tener un efecto disuasivo respecto al ejercicio de la libertad de expresión (*chilling effect*), en relación con conversaciones no relacionadas al crimen organizado.

Pasemos ahora a examinar qué tipo de protección ofrece la Carta de Derechos de nuestra Constitución en estos casos.

## V

 La Sec. 10 del Art. II de nuestra Constitución, *supra*, pág. 299, dispone que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> No se interceptará la comunicación telefónica.
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

A. El acusado plantea que la prohibición contra la interceptación de comunicaciones telefónicas contenida en la

---

*ción de conversaciones en la investigación criminal de 23 de octubre de 1985*, 94 Rev. Der. Pur. 1–54 (1985), que incluye ponencias de los Lcdos. Marcos Ramírez, Jaime Benítez, Salvador Tió y Nunzio Frattalone; R. Uviller, *Evidence from the Mind of the Criminal Suspect: A Reconsideration of the Current Rules of Access and Restraint*, 87 Colum. L.R. 1137 (1987).

sección referida aplica a la grabación de las comunicaciones orales.([14]) No tiene razón.

Respecto a la disposición referida, la Convención Constituyente expresamente rechazó una enmienda del señor Fernández Méndez que tenía el propósito de extender a la comunicación "telegráfica" la prohibición de la interceptación telefónica y *establecer que ambas se podrían interceptar mediante una orden judicial.* Diario de Sesiones, *supra*, Vol. 3, págs. 1581–1587 (1952). La enmienda derrotada hubiera tenido el doble efecto de equiparar la prohibición de la interceptación telefónica con la telegráfica, e incluir ambas de manera expresa dentro de la protección general contra registros, allanamientos e incautaciones irrazonables, sujeta al requisito de una orden judicial. En relación con este asunto, se produjo el siguiente debate en la Convención Constituyente:

Sr. FERNANDEZ MENDEZ: ... Ahora nosotros creemos, en la misma manera que Nueva York así lo adoptó en su Constitución, que el Estado no debe, por más liberal que sea, privarse de, cuando la evidencia que se va a trasmitir es evidencia de la comisión de un delito, el Estado no debe privarse del derecho de [hacerlo;] si lo hace de acuerdo con el procedimiento que establece la constitución, que es [que] bajo juramento [haya] quien afirme que lo que se va a trasmitir esclarece la comisión de un delito—y eso bajo juramento y con la sanción que conlleva el que el juramento sea falso, y juramento que sólo sirve para que un tribunal expida la orden de que se intercepte. Esas dos condiciones previas de que haya una orden: Primero, una declara-

([14]) Aunque el tribunal a quo no resolvió expresamente esta cuestión, del texto de la resolución emitida surge que apoyó este planteamiento y lo utilizó como uno de los fundamentos principales para resolver como lo hizo. En la resolución, el tribunal discutió extensamente la prohibición referida y citó con aprobación varias fuentes que apoyan teorías similares a la que propone el acusado. Además, en ningún momento discutió la jurisprudencia de este Tribunal relativa a los registros y allanamientos mediante una orden judicial. Las fuentes citadas por el tribunal sostienen esencialmente, al igual que el acusado, que si la Constitución prohíbe de manera absoluta la interceptación de la conversación telefónica, la cual según su criterio es menos privada que la oral personal, tiene que necesariamente prohibir la interceptación de comunicación oral, aun mediante una orden judicial; es decir, que la prohibición contra las interceptaciones telefónicas es más abarcadora que la protección general, según el acusado "lo más protege lo menos".

ción jurada de que Fulano y Zutano, dos criminales, van a transmitir tal mensaje que es evidencia de tal delito. Esa comunicación no debe interceptarse si no media el derecho del Estado a proteger a las partes, pero la protección que le va a conferir es de que para hacerlo tiene que venir una declaración jurada y que un tribunal autorice la intercepción.

... Ahora, yo creo que si el Estado puede obtener evidencia en un hogar, que es más sagrado que un telégrafo y que es más sagrado que un teléfono, no hay razón alguna por la cual el Estado no proteja a los no criminales contra los criminales obteniendo evidencia que los criminales [sic] van a obtener, siempre que el Estado [ob]tenga esa evidencia con los requisitos que se exigen igualmente para obtener la evidencia dentro de un hogar. Por eso es que creí que este artículo está incompleto. Este artículo debe incluir telégrafo. Y además de incluir telégrafo, debe proveer que aun en telégrafo y aun en teléfono, que el Estado tiene derecho de incautarse de esa evidencia si lo hace en la misma manera que se incauta de la evidencia dentro de un hogar .... O sea, no hay más sagrado en la comunicación telefónica o telegráfica que lo que hay en el recinto del hogar. Y si en el recinto del hogar con la declaración jurada y la orden del tribunal se puede allanar el hogar, el Estado debe tener el derecho también de allanar los cables del teléfono y los cables telegráficos cuando cumple con los mismos requisitos que cumple para allanar un hogar.

. . . . . . . .

Sr. TRIAS MONGE: En contra de la enmienda. Para indicar solamente que [en] la proposición recomendada por la [Comisión de] Carta de Derechos, de adoptarse la enmienda sugerida por el compañero Fernández Méndez, quedaría destruido definitivamente el propósito de la misma; y que está fundamentada la enmienda, la proposición de la carta de derechos, en una disposición conocida, sumamente respetada en la exposición de derechos humanos, que forma parte del sistema federal de leyes. El Congreso de los Estados Unidos, al aprobar la *Federal Communications Act* de 1934, reconoció definitivamente y sin reservas ni limitaciones de ninguna clase, que no podría ni debería en forma alguna interceptarse las comunicaciones telefónicas ....

. . . . . . . .

Sr. TRIAS MONGE: ¿Es o no es cierto que en relación con estos problemas de interferencia en la vida privada, debe leerse en la Sección 10, el apartado que estamos discutiendo, conjuntamente con la sección 8? O sea, al final de la sección 8 definitivamente se establece que toda persona tiene derecho a protec-

ción de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. ¿Es o no cierto que esta disposición es la general, que definitivamente garantiza al ciudadano en Puerto Rico lo que se conoce como el *right of privacy*, y que toda injerencia contra su vida privada, en la que naturalmente está envuelto el secreto de la comunicación telegráfica que haya recibido, queda comprendida; y que lo que se hace en la Sección 10 es exponer específicamente el problema de la intercepción de la comunicación telefónica?

Sr. BENITEZ: Le agradezco al compañero Trías Monge la intervención. Efectivamente eso es. En un caso se trata del principio genérico de la autonomía de la intimidad, del derecho a la intimidad y en este otro caso se hace la mención específica el teléfono porque ha habido intentos concretos para violentar esa intimidad y la estamos, consiguientemente, prohibiendo específicamente.

Sr. TRIAS MONGE: Una última pregunta, con la venia del compañero y del Presidente de la Convención. O sea, específicamente, como es claro que no cubre la sección diez un caso como el de "detector de pared", que mediante un detector de pared se puede saber lo que se está hablando en el interior del cuarto adyacente, ¿eso, sin embargo, quedaría cubierto bajo la sección 8?

Sr. BENITEZ: Efectivamente. Recordará usted que ha sido además enmendado para que se esclarezca que la persona tiene derecho a protección de ley contra violaciones a su intimidad en su vida doméstica y familiar. Diario de Sesiones, *supra*, vol. 3, págs. 1583–1586.

▮▮▮▮▮▮▮ De este intercambio surge con claridad que la Sec. 8 de nuestra Carta de Derechos debe interpretarse conjuntamente con la Sec. 10, *supra*.([15]) Dicha Sec. 8 crea un derecho fundamental a la protección de la intimidad que cubre tanto la protección contra registros e incautaciones en el sentido material —registrar lugares e incautar cosas— como la intrusión más abstracta a la vida privada y familiar del ciudadano. De ese derecho a la intimidad

---

([15]) En *Puerto Rico Tel. Co. v. Martínez*, supra, pág. 340, resolvimos que el texto de la Sec. 10 de nuestra Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, por su propia naturaleza, pertenece a la esfera del derecho a la intimidad consagrado en la Sec. 8 y forma parte integral de éste.

procede en nuestra jurisdicción la protección constitucional contra la intervención del Estado respecto de todo tipo de conversación oral, telefónica, telegráfica o cualquier otra posible. La intención de quienes redactaron nuestra Constitución fue que, de entre todas estas, la interceptación de la comunicación telefónica, en particular, no fuera posible *ni aun mediante una orden judicial,* a menos que mediara el consentimiento de sus titulares.[16] La protección que cobija la comunicación telegráfica, oral o de otro tipo no tiene, pues, el mismo rango jurídico que la comunicación telefónica, puesto que en la Convención Constituyente sólo la telefónica quedó excluida del esquema general de la citada Sec. 10, conforme al cual todas las otras formas de comunicación, cuya protección dimana del derecho a la intimidad consagrado en la Sec. 8, *supra, están sujetas a acceso por el Estado mediante una orden judicial fundamentada en causa probable.*

La Convención Constituyente tuvo ante sí, además, otros anteproyectos que atendían el asunto de forma más completa, con la intención de extender la prohibición a la correspondencia, comunicación telegráfica, cablegráfica, comunicación oral por medio de detectores, etc. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 191–192. Sin embargo, la Convención Constituyente optó por incluir todas estas bajo la protección general contra registros y allanamientos irrazonables, excluyendo únicamente de este esquema general la comunicación telefónica. En ese momento histórico, la prohibición de la interceptación de la

---

[16] En *Puerto Rico Tel. Co. v. Martínez,* supra, resolvimos que la prohibición de la interceptación telefónica no es una protección absoluta; que el derecho a esta protección tiene uno o varios titulares, y que si los titulares del derecho que estén involucrados en una conversación telefónica determinada renuncian a éste, ya sea explícita o implícitamente, y acceden a o solicitan la intercepción, se puede expedir una orden judicial para interceptar, de manera limitada, la conversación telefónica.

comunicación telefónica era significativa, pues bajo la jurisprudencia federal ésta no estaba protegida por la Cuarta Enmienda. Véase Chiesa, *op. cit.*, Sec. 6.26, pág. 496 esc. 611. Como bien señala Trías Monge, *op. cit.*, pág. 192:

> Para el tiempo de la Convención ya se sentían los primeros ramalazos del macartismo y se estaba penosamente consciente de que la intercepción telefónica por parte de ciertas agencias del gobierno federal era una realidad en Puerto Rico.

Todo ello revela, pues, que la comunicación telefónica ocupa un lugar particularísimo dentro del esquema establecido en la referida Sec. 10 que no se extiende a comunicaciones de otra índole. La comunicación oral está protegida en la misma medida en que están protegidos los hogares, los establecimientos comerciales, la persona, los efectos personales y demás, lo que significa que puede ser grabada siempre y cuando dicha intromisión sea razonable. Véase Chiesa, *op. cit.*, págs. 493–503. Por ello, no tiene razón el peticionario al aducir que la excepcional protección constitucional respecto a conversaciones telefónicas aplica también a la comunicación oral.

En virtud de lo señalado antes, sin embargo, debemos examinar ahora la controversia que tenemos ante nos a la luz de la protección constitucional general contra intromisiones abusivas o irrazonables.

B. La Sec. 10, *supra*, establece, entre otros, los requisitos siguientes para la expedición de la orden de registro o allanamiento (en este caso, la orden para grabar la conversación): que sea expedida por autoridad judicial y que se haya determinado la existencia de causa probable fundamentada en una declaración jurada.

*Intervención del magistrado en la determinación de causa probable*

■ El primer párrafo de la Sec. 6 de la ley, *supra,* establece claramente que, de ordinario, para poder grabar las comunicaciones en cuestión, el Secretario de Justicia debe solicitar una orden judicial del Tribunal Superior y que, una vez presentada la petición,

> ... el juez podrá emitir una orden *ex-parte* autorizando o aprobando la grabación de comunicaciones orales, si por los hechos expuestos en la petición determina que existe motivo fundado para creer que la persona se dedica a participar en actividades del crimen organizado y que a través de la grabación se obtendrá una comunicación oral relacionada al crimen organizado. 25 L.P.R.A. sec. 971q(e).([17])

Ello no obstante, el tribunal a quo resolvió que la intervención del magistrado en la determinación de causa probable para la expedición de la orden dispuesta en la ley no cumple con el referido requisito constitucional, porque el mecanismo adoptado viola el principio de la separación de poderes. En esencia, el foro de instancia resolvió que, bajo la ley Núm. 36, *supra,* la participación del juez en la determinación de causa probable para la expedición de la orden no está debidamente separada de la del Secretario de Justicia, y que la ley prácticamente obliga al juez a adoptar la determinación del Secretario de la existencia de causa probable. No tiene razón.

■ El requisito constitucional de que la orden de registro o allanamiento sea expedida por autoridad judicial tiene el propósito de interponer la figura neutral del ma-

---

([17]) La utilización de la frase "motivo fundado" en lugar de "causa probable" no presenta ningún problema de índole constitucional. El concepto "motivo fundado" se ha definido en nuestra jurisprudencia como "aquella *información y conocimiento* que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito". (Énfasis en el original.) *Pueblo v. Martínez Torres,* 120 D.P.R. 496, 504 (1988), y casos allí citados. Reiteradamente hemos resuelto que este concepto es sinónimo al de "causa probable" para efectos de la expedición de la orden. Íd.; *Pueblo v. Díaz Díaz,* 106 D.P.R. 348, 353 (1977).

gistrado entre la del ciudadano y la del Estado, para asegurar que entre el interés del Estado de combatir el crimen y de obtener evidencia incriminatoria y el interés del ciudadano de que lo dejen tranquilo o de mantener escondida evidencia incriminatoria, se interponga el juez, cuyo interés es que se cumpla la ley, lo que incluye la protección contra registros irrazonables. Del Informe de la Comisión de la Carta de Derechos y nuestra jurisprudencia surge claramente que la expresión "autorización judicial" se adoptó con el propósito deliberado de privar a los fiscales de la autoridad para expedir órdenes. Véanse: *Diario de Sesiones*, *supra*, Vol. 4, pág. 2568; 4 L.P.R.A. sec. 202; *Pueblo v. Tribunal Superior*, 75 D.P.R. 535 (1953). La exclusividad del Poder Judicial de expedir las órdenes incluye la determinación de causa probable.

No quiere esto decir, sin embargo, que los fiscales —en este caso los fiscales o el Secretario de Justicia— no puedan hacer una determinación preliminar de que, a su juicio, se cumple con el requisito de causa probable en cada caso, como método profiláctico para evitar la presentación de solicitudes inmeritorias y el mal uso de los recursos del Poder Ejecutivo y de la Rama Judicial. Este es el verdadero alcance de la disposición estatutaria sobre la determinación de causa probable del Secretario de Justicia contenida en la ley. 25 L.P.R.A. sec. 971q(d)(1). Nada en el texto de la propia ley sugiere que dicha determinación tenga carácter final u obligatorio para efectos de la expedición de la orden o que el Juez esté obligado a acatarla sin más.

Esta interpretación está avalada, además, por el debate legislativo habido en ocasión de la aprobación del P. de la C. 461, del cual surgió la Ley Núm. 36, *supra*. El Informe de la Comisión de lo Jurídico Penal de la Cámara de Representantes sobre el P. de la C. 461 de 13 de mayo de 1985, 10 ma Asamblea Legislativa, 1ra Sesión Ordinaria, págs. 10–11, explica lo siguiente:

... Primero, el proyecto propone un filtro para la solicitud. El

fiscal a cargo de la investigación, el Superintendente de la Policía o el Director del Negociado de Investigaciones Especiales son los únicos que pueden solicitar del Secretario que realice las gestiones judiciales para que expida la autorización. La idea es la de crear un mecanismo de corroboración de la información que utiliza el agente investigador que interesa la autorización para llevar a cabo la grabación. Aquellos que reciben la información del agente y elevan la solicitud ante el Secretario, tendrían que corroborar la certeza de lo que se alega, ya que a ellos compete probar y justificar la necesidad de llevar a cabo la intervención o grabación. Nótese que éstos podrían ser criminalmente responsables si obtienen la autorización a base de información falsa, cuando conocían la falsedad.

Además, el Art. 10 del Reglamento sobre la Grabación de Comunicaciones Orales No Telefónicas en el Curso de Investigaciones sobre el Crimen Organizado de diciembre de 1987 (en adelante Reglamento) adoptado por el Departamento de Justicia, sobre la evaluación interna de la solicitud, dispone, en lo pertinente, lo siguiente:

El Secretario, cuando así lo estime procedente, podrá encomendar al Fiscal a cargo de la División para que realice, a la mayor brevedad, la evaluación legal de rigor y le recomiende lo que corresponda en derecho en torno a la solicitud. A estos efectos, el Fiscal a cargo de la División deberá determinar la suficiencia de la solicitud y si la investigación en cuestión está relacionada al crimen organizado conforme a los criterios que establece la Ley. Dicho Fiscal deberá cerciorarse de la viabilidad técnica de que se pueda llevar a cabo la grabación, si el equipo a utilizarse es adecuado y re[ú]ne los requisitos de confiabilidad y competencia técnica y si las circunstancias ofrecen garantías suficientes de seguridad para las personas que consientan, transmitan y efectúen las grabaciones. Reglamento, *supra*, pág. 6.

Finalmente, el tribunal determinó que la Ley Núm. 36, *supra*, es inconstitucional porque obliga al juez a determinar la existencia de causa probable, descansando esencialmente en la solicitud del Secretario de Justicia, la cual está fundamentada en información de personas que no están disponibles para ser examinadas por el juez bajo juramento.

No es correcto afirmar que nuestra Constitución requiere que el magistrado examine al declarante para determinar la existencia de causa probable. Por el contrario, en más de una ocasión hemos resuelto expresamente que el examen personal del declarante no es un requisito constitucional. *Pueblo v. Rivera Rodríguez*, 123 D.P.R. 467, 475–479 (1989); *Laureano Maldonado v. Tribunal Superior*, 92 D.P.R. 381 (1965). Particularmente en *Pueblo v. Rivera*, supra, explicamos que el texto constitucional pertinente requiere únicamente que la determinación de causa probable para la expedición de la orden esté "apoyada en juramento o afirmación". De acuerdo con ello, decidimos que el agente del orden público que desea la emisión de una orden de registro tiene que comparecer personalmente ante el magistrado con una declaración jurada que exponga los hechos que justifiquen su expedición. En esos casos, si la declaración jurada "es completa, clara, detallada, libre de contradicciones y el juez que la revisa no tiene dudas sobre algún extremo de la misma, no es requisito indispensable que el juez interrogue al declarante". *Pueblo v. Rivera Rodríguez*, supra, pág. 477. Basta con que el solicitante esté disponible para ser interrogado por el juez, de ser necesario. Finalmente, resolvimos allí que esta norma no significa una "abdicación de la función judicial activa e inquisitiva previa a la expedición de la orden", puesto que no releva al magistrado de examinar rigurosamente la declaración del agente.

Conforme a la Ley Núm. 36, *supra*, y el reglamento correspondiente, cualquier agente investigador del Departamento de Justicia, del Negociado de Investigaciones Especiales y de la Policía y los Fiscales puede solicitar al Secretario de Justicia autorización para grabar, por conducto del Director del Negociado, el Superintendente de la Policía o el Jefe de Investigaciones y Procesamiento Criminal, según sea el caso. La solicitud se hace por escrito y es firmada y juramentada por el solicitante y contiene una

narración de los hechos que apoyan la solicitud, además del nombre de la persona —sea un investigador, un informante, un agente encubierto o una persona particular— que haya dado su consentimiento para la grabación. Cuando la persona que consiente a la grabación es una persona particular, su consentimiento se tiene que evidenciar mediante una acta suscrita por ésta. Luego, la solicitud es evaluada por el Secretario o un Fiscal. Finalmente, es presentada ante el juez en el procedimiento *ex parte* para la obtención de la orden por el Secretario de Justicia o un representante suyo. Toda solicitud debe estar firmada también por el Secretario de Justicia. Tanto la ley como el reglamento describen un procedimiento bien detallado y riguroso, lleno de garantías de confiabilidad y confidencialidad.

El tribunal a quo determinó que este mecanismo tiene el efecto de prohibir que el juez examine al declarante —sea éste el agente o el informante— de estimarlo necesario. Estamos de acuerdo con el tribunal de instancia en que, al redactarse la ley y el reglamento, no se cumplió a cabalidad con los requisitos jurisprudenciales antes mencionados respecto de la declaración jurada. Nótese que la ley no requiere que el Secretario de Justicia juramente la solicitud que le presentará al juez, sólo que la firme. El Procurador General alega que este defecto fue subsanado por el Art. 7(a) del Reglamento, *supra.* Sin embargo, dicho artículo exige únicamente la juramentación del solicitante, quien, en la mayoría de los casos, será un agente investigador y no el propio Secretario. Por otro lado, el Art. 11 del Reglamento, *supra,* no requiere que sea el solicitante quien comparezca ante el juez, sino que la solicitud tiene que ser presentada por el Secretario de Justicia personalmente o un fiscal designado por él. La ley, por su parte, no es tan específica; sólo requiere que se mantenga la confidencialidad del procedimiento de obtención de la orden y permite la presencia del fiscal o un "representante del Secretario de

Justicia". Estas disposiciones, tomadas en conjunto, sugieren que la solicitud será presentada ante el magistrado por una persona (el Secretario de Justicia o un representante) diferente a la que prestó la declaración jurada (un agente). Conforme a lo resuelto en *Pueblo v. Rivera Rodríguez*, supra, esto no es suficiente.

La situación creada por el defecto descrito anteriormente, sin embargo, no es una muy compleja. Cabe señalar, en primer lugar, que la Ley Núm. 36, *supra*, fue aprobada antes de nuestra opinión en el referido caso, y que el lenguaje allí adoptado es menos específico que el del Reglamento y permite la presencia de un fiscal o un "representante" del Secretario de Justicia en el procedimiento de la obtención de la orden. Surge del lenguaje de la Sec. 6(1) de la ley, 25 L.P.R.A. sec. 971q(1), que el propósito de esta disposición era preservar la naturaleza confidencial del procedimiento y no evitar que el magistrado examinara la declaración del agente solicitante. Evidencia de esto es que el agente solicitante no sólo tiene que cumplir con unos rigurosos requisitos de información, (Sec. 6(d) de la Ley, 25 L.P.R.A. sec. 971q(d), y el Art. 7 del Reglamento, *supra*), sino que además está sujeto a una convicción por perjurio de probarse que su declaración es falsa, (Sec. 7 de la ley, 25 L.P.R.A. sec. 971r). En fin, en estos casos, el requisito de poner a disposición del tribunal al declarante, de ser necesario, no iría contra la naturaleza confidencial del procedimiento y sería, además, de fácil cumplimiento.

 Por los fundamentos expuestos, al evaluar hoy la validez de la ley en su totalidad, somos del criterio que no es necesario declararla inconstitucional por sus deficiencias respecto del procedimiento descrito anteriormente. Se trata de deficiencias que, aunque importantes, son subsanables y no justifican invalidar *in toto* la legislación ante nos. Para salvaguardar las garantías y los derechos constitucionales contenidos en las Secs. 8 y 10 de nuestra Carta de Derechos, *supra*, es suficiente que resol-

vamos hoy que la solicitud de la orden judicial para grabar *deberá ser presentada personalmente por el agente declarante* y *deberá ser jurada por éste.* En casos como el de autos, en que el defecto constitucional es limitado y pueda ser subsanado fácilmente en armonía con la intención legislativa, este Tribunal tiene la facultad de diseñar un remedio que rectifique el defecto. Por lo menos desde la monumental decisión de *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958), hemos reconocido la vigencia en Puerto Rico del principio cardinal adoptado por el Tribunal Supremo de Estados Unidos en *Ashwander v. Valley Authority,* 297 U.S. 288, 346 (1936), de que *cuando se cuestiona la validez de un estatuto, aun cuando se suscite una duda seria sobre su constitucionalidad, el Tribunal primero se asegurará de si existe una interpretación razonable del estatuto que le permita soslayar la cuestión constitucional.* Por eso, citando a *Milán Rodríguez v. Muñoz,* 110 D.P.R. 610, 618 (1981), señalamos que,

> ... al examinar un estatuto [para determinar su validez constitucional], "el Poder Judicial, en abono de una deferencia hacia el Poder Legislativo, debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de cada ley". *Nogueras v. Hernández Colón,* 127 D.P.R. 405, 412 (1990). Véanse, además: *Banco Popular v. Mun. de Mayagüez,* 126 D.P.R. 653, 661 (1990); *P.R.P. v. E.L.A.,* 115 D.P.R. 631, 642 (1984).[18]

Ejemplo de esto ha ocurrido en casos recientes de este Tribunal, en los cuales enfrentamos situaciones más complejas que la del caso de autos. Véanse: *Sánchez y Colón v. E.L.A. I,* 134 D.P.R. 445 (1993); *Granados v. Rodríguez Estrada V,* 127 D.P.R. 1 (1990); *Granados v. Rodríguez Estrada II,* 124 D.P.R. 593 (1989). Además, reiteradamente hemos afirmado la política judicial de de-

---

[18] De igual forma, cabe recordar que al evaluar una ley, es responsabilidad de este Tribunal suplir aquello que falte en una ley para hacerla coherente y conformarla a la intención del legislador. *Pueblo v. Villafañe, Contreras,* 139 D.P.R. 134 (1995); *P.N.P. y P.I.P. v. Rodríguez Estrada,* 122 D.P.R. 490, 500 (1988).

cretar la inconstitucionalidad de una ley sólo cuando ello sea indispensable, *Hernández Agosto v. Betancourt*, 118 D.P.R. 79 (1986); *Molina v. C.R.U.V.*, 114 D.P.R. 295 (1983); *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139 (1973); *E.L.A. v. Aguayo*, supra, y no entrar a considerar la inconstitucionalidad de una ley o de una actuación a menos que ello sea imprescindible para resolver la controversia, *Pueblo v. Ramos Santos*, 132 D.P.R. 363 (1992); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971). En este caso no lo es.(19)

■ Por otro lado, en los casos cuando la grabación se obtenga por medio de un informante o una persona particular, o con su cooperación, el examen del informante en adición al del agente no es necesario.

■ La determinación de causa probable puede estar fundamentada en los hechos percibidos por el agente declarante, por información recibida de un tercero o por una combinación de ambos. *Pueblo v. Muñoz, Colón y Ocasio*, supra; *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982); *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977). En aquellos casos en que la declaración jurada del agente se fundamente en confidencias de terceros, la confiabilidad de éstas debe ser examinada por separado de acuerdo con el criterio anunciado en el caso *Pueblo v. Díaz Díaz*, supra, con énfasis particular en la corroboración de las confidencias por el agente. *Pueblo v. Muñoz, Colón y Ocasio*, supra; *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992). Al revisar la determinación de causa probable en esos casos, lo medular

---

(19) Adoptamos la interpretación referida con carácter prospectivo. Respecto de las órdenes previamente emitidas, los tribunales, al examinar la corrección de la determinación de causa probable, deberán considerar si la ausencia en la vista del solicitante en realidad hubiese afectado la determinación de causa probable hecha por el juez. De lo contrario, si de la solicitud surgían suficientes garantías de confiabilidad y el análisis de la totalidad de la prueba presentada apoya la determinación de causa probable, el incumplimiento con el requisito que exigimos hoy no será motivo, por sí solo, para invalidar las órdenes emitidas al amparo de la Ley Núm. 36, *supra*, anterior a esta opinión.

es si la evidencia considerada por el magistrado, en su totalidad, proveía una base sustancial para su determinación de causa probable.

La razonabilidad de esta norma es patente en casos como el de autos. La propia ley y el referido reglamento establecen unos mecanismos de corroboración adicionales a los que hemos sugerido anteriormente. En este aspecto, es de particular importancia el requisito esencial dispuesto en la ley de que para la expedición de la orden se obtenga la autorización de una de las personas que vaya a participar en la conversación. Cuando el tercero sea el informante que está cooperando con los agentes —ya sea porque va a grabar personalmente la grabación o porque ha consentido a ella— su consentimiento deberá constar por escrito y ser anejado a la solicitud de la orden. La disposición pertinente requiere que cuando se trate de una persona particular, no un agente, el consentimiento de ésta sea evidenciado mediante "acta suscrita por la persona en presencia del investigador o su supervisor, dando fe de que el consentimiento lo presta libre y voluntariamente". Art. 7(j) del Reglamento, *supra*, pág. 5. Este mecanismo y los otros dispuestos en la ley y en el Reglamento, para la verificación y evaluación interna de la suficiencia de la solicitud, permiten corroborar adecuadamente la fuente del conocimiento del informante, su credibilidad y la confiabilidad de la información provista. No se requiere más para la expedición de la orden, siempre y cuando el magistrado esté satisfecho de la confiabilidad de la información provista de acuerdo con la totalidad de la prueba presentada.

*Contenido y duración de la orden*

Un aspecto de la ley que amerita especial atención es el relacionado al contenido y la duración de la orden judicial que autorice la grabación que se interesa. Debemos examinar si lo provisto en la ley cumple con el requisito de espe-

cificidad que deben satisfacer en general las órdenes judiciales de registro y allanamiento.

La ley no se refiere directamente al contenido de la orden judicial como tal, pero dispone lo pertinente colateralmente al señalar lo que debe incluir la petición del Secretario de Justicia para poder obtener dicha orden. Por ende, la especificidad de la orden judicial está delimitada por la descripción de lo que se interesa grabar, según surja de la petición del Secretario.

■ Conforme con la ley, dicha petición debe precisar con la mayor particularidad posible lo que se interesa grabar. Según lo dispuesto en su Art. 18 (25 L.P.R.A. sec. 971q(d)(4)) es evidente que la petición debe contener: (1) una descripción del patrón de actividad del crimen organizado que se está investigando; (2) el nombre de la persona cuya comunicación oral se interesa grabar; (3) una descripción de la relación de dicha persona con el crimen organizado; (4) una descripción de la comunicación oral relacionada con el crimen organizado que se interesa grabar; (5) un estimado del tiempo necesario para poder realizar la grabación, y (6) una descripción del mecanismo de grabación que será utilizado. Véase, además, 25 L.P.R.A. sec. 971q(b) y (c).

■ Como puede observarse, la ley no deja de ningún modo al arbitrio del agente qué conversaciones va a grabar. Por el contrario, el agente sólo podrá grabar la conversación que un juez específicamente autorice, y dicho juez sólo puede autorizar la grabación de una comunicación oral que esté concretamente relacionada con actividades del crimen organizado.

■ En virtud de lo dispuesto por la Sec. 10 del Art. II de nuestra Constitución, *supra*, una orden de registro o allanamiento —en este caso, la orden para grabar— debe describir con particularidad el lugar, la persona o la cosa que sea objeto de la orden. En nuestra jurisprudencia, he-

mos reconocido que el propósito de dicho requisito es "impedir el uso arbitrario de la discreción por parte del agente que practica el registro o incautación". *Pueblo v. Meléndez Rodríguez*, supra, pág. 617, citando a O.E. Resumil de San Filippo, *Práctica jurídica de Puerto Rico: derecho procesal penal*, New Hampshire, Ed. Equity, 1990, T. I, pág. 294. Véase, además, Chiesa, *op. cit.*, págs. 351–353. Hemos resuelto, además, que:

> Si el propósito del registro y allanamiento es ocupar artículos específicos, ellos han de describirse con precisión en la orden, de manera que limite lo más posible el alcance de la intervención gubernamental. Si, por el contrario, se busca ocupar cualquier propiedad no específica, pero de determinado carácter que, por su naturaleza sea ilegal, *no es necesaria una descripción detallada de los objetos y bastará una caracterización general sobre su naturaleza.* Conforme a ello, en Puerto Rico hemos permitido tal clase de descripción cuando lo que se pretende ocupar no es un objeto u objetos en particular, sino artículos de cierta clase o naturaleza. (Citas omitidas y énfasis suplido.) *Pueblo v. Meléndez Rodríguez*, supra, págs. 617–618.

Resolvimos allí, además, que el requisito de especificidad puede ser satisfecho incorporando, por referencia, la declaración jurada que sirve de apoyo para la determinación de causa probable. Íd. Por lo antes señalado, y a la luz de las normas aludidas, es evidente que la ley ciertamente cumple con los referidos requisitos sobre especificidad.

En cuanto a la duración de la orden judicial, es decir, en cuanto al tiempo dentro del cual podrá ejecutarse la orden que autoriza la grabación concreta que se interesa, el inciso (f) del Art. 6 de la ley, 25 L.P.R.A. sec. 971q(f), dispone que dicha grabación deberá llevarse a cabo dentro del período de tiempo que sea necesario, que el tribunal ha de fijar, y que en ningún caso deberá exceder el término de tres (3) meses. Si en ese período no se realiza la grabación, y aun se quiere llevar a cabo ésta, el Secretario de Justicia deberá presentar una nueva solicitud y obtener

una nueva orden judicial a tales efectos, las cuales deben cumplir, por separado, con todos los requisitos que exige la ley.

■ Debe observarse que el período de tres (3) meses que fija la ley no es uno dentro del cual el agente puede grabar cualquier comunicación oral que la persona relacionada con el crimen organizado tenga durante ese tiempo. Lo que se autoriza en ese período no es una serie de grabaciones fundamentadas en una sola determinación de causa probable. Lo único que se puede grabar en el término referido es la conversación o las conversaciones concretas que se hayan identificado en la orden judicial.

■ También debe observarse que el período de tres (3) meses es un término *máximo*. La ley contempla que de ordinario el tribunal fijará el tiempo dentro del cual debe ejecutarse la orden judicial, fundamentada en su estimado de lo que sea necesario para ello. De ordinario, pues, no se fijará un término de tres (3) meses, sino algún período menor, según las circunstancias de cada caso. En el de autos, el tribunal de instancia fijó un término máximo de treinta (30) días para llevar a cabo la grabación concreta que se interesaba, lo que es evidentemente razonable.

Al evaluar este esquema sobre la duración de la orden judicial, es menester tener en cuenta las graves dificultades inherentes a las investigaciones relacionadas con el crimen organizado. En otras situaciones análogas a la que ahora nos concierne hemos reconocido, como principio general, que no se puede definir con exactitud los extremos que deben cubrirse cuando se trata de agentes encubiertos. "Comprendemos que en nuestra misión de pautar en la administración de la justicia criminal la gama de situaciones es *demasiado extensa para poder exigir normas fijas e invariables*. Sólo intentaremos establecer unas guías mínimas para garantizar la pureza de los procedimientos". (Énfasis suplido.) *Pueblo v. Ayala Ruiz*, 93 D.P.R. 704, 706 (1966). No pueden fijarse reglas muy rígidas en este con-

texto porque lo que puede ser razonable en casos comunes, puede ser irrazonable en casos como el de marras. *Pueblo v. Tribunal Superior*, 91 D.P.R. 19 (1964).

En resumen, pues, las restricciones que tiene la ley relativas a la norma de especificidad nos parecen suficientes para las investigaciones relativas al crimen organizado en cuestión, en las cuales la necesidad de utilizar agentes encubiertos requiere mayor flexibilidad que en los casos corrientes en que se interesa incautar abiertamente un objeto particular. Se cumple con lo esencial, que es que hayan garantías que limiten debidamente el arbitrio del agente.

## Otras garantías

La ley contiene, además, otras garantías y limitaciones que protegen adecuadamente la posible intromisión incidental sobre conversaciones no relacionadas al crimen.

La ley no permite de manera alguna que en la investigación del crimen organizado se graben comunicaciones relacionadas con actividades políticas o de cualquier otra naturaleza que no sea del crimen organizado, según se define en la ley. 25 L.P.R.A. sec. 971q(b). Por ello, fuera de intercambios superficiales que puedan ocurrir con otras personas en el curso de una investigación, no se podrán grabar conversaciones cuyo contenido sea de carácter privado o íntimo y, por lo tanto, fuera del ámbito permitido por la correspondiente orden judicial. De ocurrir una intromisión sustancial de esa naturaleza, el agente o informante podría incurrir en el delito dispuesto en el Art. 145 del Código Penal, 33 L.P.R.A. sec. 4186, o en el delito impuesto en la Sec. 7 de la citada ley, 25 L.P.R.A. sec. 971r. El individuo así afectado podría tener, además, una acción según el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, contra el Estado por la intromisión indebida con su derecho de intimidad.

Por otro lado, las grabaciones obtenidas se deben mantener en estricta confidencialidad en todo momento y, aunque la ley no lo contempla, aquellas partes de la grabación que no sean pertinentes al proceso criminal correspondiente podrían ser protegidas por el juez según la Regla 95B de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

La ley contiene, además, otras garantías y limitaciones que apoyan su razonabilidad; a saber:

1. El Secretario de Justicia está obligado a informar al tribunal cualquier cambio en las circunstancias que dieron lugar a la solicitud. 25 L.P.R.A. sec. 971q(g).

2. Durante la vigencia de la orden, los agentes que estén a cargo de las grabaciones deberán mantener un expediente detallado con cada comunicación grabada y le someterán informes semanales al Secretario de Justicia sobre todo lo ocurrido. 25 L.P.R.A. sec. 971q(h).

3. Toda grabación deberá hacerse de manera tal que se evite que ésta sea alterada o editada, y éstas serán selladas, conservadas y custodiadas de acuerdo con lo que disponga el juez y el Reglamento adoptado por el Tribunal Supremo, inmediatamente después de que se haya grabado la comunicación, 25 L.P.R.A. sec. 971q(i). *Reglas del Tribunal Supremo*, 120 D.P.R. 126 (1987).

4. La ley codifica como delitos graves hacer declaraciones falsas para obtener la orden para grabar; solicitarla a base de declaraciones que sean falsas, cuando se conozca su falsedad, o divulgar indebidamente que se ha expedido una orden que autorice la grabación de la comunicación. 25 L.P.R.A. sec. 971r.([20])

---

([20]) La Sec. 7 de la Ley Núm. 36, *supra*, 25 L.P.R.A. sec. 971r, establece que los delitos de hacer declaraciones falsas y de incluir, a sabiendas, declaraciones falsas en la solicitud de la orden para grabar, conllevan una pena fija de cinco (5) años de reclusión, que puede ser aumentada a ocho (8) años de mediar agravantes, y una pena adicional discrecional de multa entre $5,000 y $10,000. A su vez, el delito de

*Diligenciamiento de la orden*

El acusado alega que el mecanismo sobre el particular dispuesto en la ley es irrazonable porque, al diligenciarse la orden, no se da a conocer la autoridad de los agentes previo a la grabación y por la participación activa del agente o informante en la conversación que sea objeto de la orden.

 Anteriormente hemos reconocido que, como regla general, los agentes que van a diligenciar una orden deben dar a conocer la autoridad de que están revestidos. *Pueblo v. Bonet Flores*, 96 D.P.R. 685 (1968). Sin embargo, éste no es un requisito absoluto. Hemos resuelto que se puede prescindir de él bajo circunstancias en las que dar el aviso constituiría un riesgo para la seguridad de los agentes o aumentaría la probabilidad de que se destruya la evidencia que se pretende conseguir. Íd. La situación general contemplada en la ley es indudablemente una de esas circunstancias. Por razones obvias, si se le avisara al sujeto que es objeto de la investigación la existencia de la orden y la autoridad del que la va a diligenciar, no sólo se pondría en peligro la vida del informante o agente encubierto, sino que se desvanecería cualquier posibilidad de grabar la conversación delictiva.

 En relación con lo anterior, cabe señalar además que en *Pueblo v. Carballosa y Balzac*, 130 D.P.R. 842 (1992), impartimos nuestra aprobación al uso apropiado del agente encubierto en la investigación del crimen, en particular en aquellos casos relacionados con delitos de la función pública como lo es el de marras, "siempre y cuando su intervención no sea para inducir al acusado a la comi-

---

divulgación ilegal conlleva una pena fija de dos (2) años de reclusión, que puede ser aumentado a tres (3) años de mediar agravantes o reducido hasta un (1) año de existir circunstancias atenuantes. El tribunal podrá imponer, además, una multa entre $5,000 y $10,000. Finalmente, ninguna persona acusada por alguno de estos delitos podrá hacer alegación preacordada, y de resultar convicto, no tendrá derecho a disfrutar de una sentencia suspendida.

sión de un delito que de otro modo no hubiera intentado cometer". Nuestra determinación anterior no es menos válida en este caso por el mero hecho de que aquí el agente porta un medio de grabación o de trasmisión de comunicaciones, puesto que su utilización no afecta de modo alguno la voluntariedad del sospechoso de cometer el acto delictivo.

Dentro de esos parámetros, nos parece razonable la participación de informantes o agentes encubiertos en la grabación de conversaciones relacionadas a la comisión de un crimen como método investigativo. El aviso previo de parte del agente sobre su identidad frustraría el propósito de la orden y elimina completamente la utilidad de este mecanismo en la investigación del crimen, y pondría, además, en considerable riesgo de peligro la vida del agente o informante.[21]

----

[21] En relación con esto, el acusado también alegó que el aviso previo de la autoridad del agente y de la existencia de la orden es necesario para preservar su derecho constitucional a no autoincriminarse y a estar asistido por un abogado antes de que se le graben declaraciones incriminatorias involuntarias. Surge de la resolución recurrida que el tribunal de instancia, aunque brevemente, también mencionó esta cuestión como una importante para decidir como lo hizo. Por ello, cabe señalar que estos planteamientos son claramente inmeritorios.

Reiteradamente hemos dicho que cuando una investigación criminal se centra sobre una persona en particular y dicho sospechoso se encuentra bajo custodia, es que los agentes del orden público están obligados a advertirle a éste de una serie de derechos constitucionales que nuestro ordenamiento jurídico les garantiza, entre los que se encuentran los mencionados anteriormente. Para que un acusado pueda invocar estos derechos al solicitar la supresión de evidencia presentada en su contra, la conversación que se quiere suprimir tiene que ser el resultado de una coerción por parte de los agentes del Estado. Para ello tienen que concurrir los requisitos siguientes: (1) que ya la persona era sospechosa del delito; (2) que el acusado se encontrara bajo custodia al hacer la declaración en cuestión; (3). que la declaración haya sido producto de un "interrogatorio" por parte de los agentes del orden público, y (4) que no se le hayan hecho las debidas advertencias o, si fueron hechas, no se haya renunciado efectivamente a los derechos aludidos. *Pueblo v. López Guzmán*, 131 D.P.R. 867 (1992), y casos allí citados. Estos requisitos no se encuentran presentes en este caso. El acusado en el caso de marras ni estaba bajo custodia ni fue interrogado.

El acusado alega, en esencia, que una declaración es involuntaria per se, y por lo tanto inadmisible en el juicio, cuando quien la dijo no era consciente de que estaba hablando con un informante o agente encubierto, aunque éste al momento no se encontrara bajo custodia y fuera consciente de la presencia de otra persona, pero desconociera su identidad. No tiene razón. Para invocar estos derechos al solicitar la supresión de evidencia incriminatoria no basta con que éste no tuviera conocimiento de que su conversación estaba siendo escuchada por agentes del orden público. La

C. Como señalamos anteriormente, la ley impugnada provee que el Secretario de Justicia podrá autorizar la grabación sin una orden judicial en determinadas situaciones extraordinarias, siempre y cuando someta al tribunal la correspondiente solicitud dentro de veinticuatro (24) horas luego de emitida la autorización referida. En estos casos, la ley dispone que, de no someterse la solicitud dentro del término dispuesto o si dicha solicitud fuese posteriormente denegada, la grabación obtenida sin una orden judicial no será admisible en evidencia. 25 L.P.R.A. sec. 971q(c).

Anteriormente, hemos establecido que se presume irrazonable un registro o una incautación sin una orden judicial previa. Ello no obstante, la protección contra registros y allanamientos irrazonables no es absoluta y permite excepciones fundadas en intereses apremiantes. La validez de un registro o incautación del Estado sin una orden judicial previa está sujeta al balance de los intereses en conflicto. De acuerdo con este modo de análisis, el Estado deberá demostrar, caso a caso, la existencia de un interés apremiante y que, contrapesado éste con los intereses del individuo, el balance sea favorable al Estado. *Pueblo v. Acevedo Escobar*, supra, pág. 776. En relación con la incautación de material incriminatorio en particular, existe un interés apremiante del Estado en investigar el crimen efectivamente, que puede ser tan urgente en situa-

---

exclusión en estos casos está dirigida *únicamente* a confesiones coaccionadas, para evitar que se procese criminalmente a un individuo a base de una confesión que sea resultado de actos de coerción del Estado, porque existe una probabilidad muy alta de que la evidencia obtenida así no sea cierta y el sistema de justicia criminal de una sociedad democrática como la nuestra no debe estar apoyado por técnicas de investigación tan poco confiables y tan susceptibles de abusos por parte del Estado. La supresión de evidencia no está fundamentada, como aparenta creer el acusado, en un derecho a mantener secreta la evidencia incriminatoria. Por ello, si no se hace un planteamiento de que la comunicación ha sido producto de la coerción de los agentes, no procede la supresión, aun cuando el acusado no haya estado ofreciendo esa comunicación conscientemente a los agentes. En estos casos, lo medular es si hizo las declaraciones incriminatorias de manera voluntaria.

ciones de emergencia que justifiquen medidas como las aludidas.

El texto de la ley sugiere que, lejos de intentar establecer una práctica contraria a esta interpretación, ésta lo que hace es limitar la posibilidad contemplada a unas situaciones muy excepcionales. La ley requiere expresamente que antes de que se proceda a grabar sin orden, exista una de las circunstancias extraordinarias que se *enumeran* en la ley; que pase por el cedazo del Secretario de Justicia, quien deberá tomar una determinación preliminar de la existencia de causa probable fundamentada en las mismas consideraciones que un juez estaría obligado a considerar, y, además, establece una rigurosa regla de exclusión, de acuerdo con la cual si no se solicita la orden veinticuatro (24) horas luego de haber sido autorizada la grabación sin una orden judicial o si, de haber sido solicitada conforme a la ley, ésta hubiese sido denegada por el juez, la grabación así obtenida será automáticamente inadmisible en evidencia y deberá ser destruida una vez la decisión que deniega la orden para la grabación sea final y firme.

El tribunal a quo resolvió que esta disposición contribuía significativamente al potencial de abuso del Estado y era inconstitucional de su faz.

En el caso de marras, la grabación impugnada se hizo por medio de una orden judicial. Por la tanto, no tenemos ante nos ahora una situación concreta que requiera determinar si una grabación como las aludidas es válida o no. Reiteradamente hemos resuelto que no entraremos a examinar la validez constitucional de una controversia prematuramente, *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993); *Hernández Agosto v. Betancourt*, supra; *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982); *Vives Vázquez v. Tribunal Superior*, supra, pág. 150; *E.L.A. v. Aguayo*, supra; *por lo que dejamos esta cuestión para resolverla luego, de surgir el caso apropiado para*

*ello.*[22] Cualquier reserva sobre la validez constitucional de esta particular disposición de la ley debe aquilatarse propiamente a la luz de hechos concretos que ilustren cómo en efecto se ha aplicado ésta. No tenemos aquí una medida que de su mera faz coarte o "congele" derechos fundamentales, por lo que no es necesario dilucidar su validez sin conocer el uso concreto que se le ha dado a ésta en las limitadas y excepcionales circunstancias que la ley autoriza. Véase *Pueblo v. Hernández Colón*, 118 D.P.R. 891 (1987). En resumen, pues, no validamos hoy esta disposición de la ley ni la declaramos inconstitucional. Sencillamente, dejamos el asunto pendiente para decidirlo cuando sea procedente.

## VI

El acusado alega, además, que el esquema establecido en la Ley Núm. 36, *supra*, viola el principio constitucional de separación de poderes, no sólo porque entiende que la participación del juez en la determinación de causa probable no está debidamente separada de la determinación del Secretario de Justicia durante el procedimiento investigativo, que ya examinamos, sino, además, porque entiende que la custodia de la grabación por parte del tribunal, 25 L.P.R.A. sec. 971q(i), equivale a convertir al juez en un nivel más en la "cadena de evidencia".

En virtud del principio constitucional de la separación de poderes[23] las facultades delegadas por el pueblo al Gobierno se distribuyen entre las tres (3) ramas: la Judicial, la Ejecutiva y la Legislativa. Con este principio se persigue evitar la concentración de poderes en una sola

---

[22] *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993) (una cuestión no se debe resolver cuando un expediente no sea apropiado para ello); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982) (una cuestión no se debe resolver en abstracto).

[23] Sec. 2 del Art. I de nuestra Constitución, L.P.R.A., Tomo 1.

rama de gobierno, o el abuso de poder por parte de una de ellas; establecer un sistema de pesos y contrapesos que mantenga el equilibrio en el manejo del poder, y asegurar una eficiente interacción entre las tres ramas gubernamentales. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 611 (1988); *Silva v. Hernández Agosto*, 118 D.P.R. 45, 47 (1986). El principio aludido no implica que las diferentes ramas del Gobierno deban mantenerse absolutamente separadas en todo momento ni que funcionen "en el vacío, independientemente de las otras". *Noriega v. Hernández Colón*, supra; *P.I.P. v. C.E.E.*, supra. Puede existir un grado de interrelación entre ellas, siempre y cuando se mantenga íntegra la autoridad de cada una de ellas. Por ello, para decidir si alguna disposición viola el principio de la separación de poderes, debe determinarse si la concesión de facultades que dicha disposición efectúa concentra indebidamente el poder gubernamental en una de las ramas o si disminuye la independencia de alguna de ellas en el fiel desempeño de sus funciones.

En cuanto a la determinación de causa probable para la expedición de la orden, ya hemos resuelto que ésta es una función exclusiva de la Rama Judicial y que el mecanismo establecido en la Ley Núm. 36, *supra*, no incide sobre ella. La ley impone un sistema de contrapesos internos que tiene el propósito de mejorar el desarrollo de las investigaciones supervisadas por el Departamento de Justicia y la Policía. Éste no impone trabas a la tarea exclusiva e indelegable que tienen los tribunales de determinar la existencia de causa probable para la expedición de una orden de registro, caso a caso, de manera separada e independiente del juicio de la Rama Ejecutiva.

En relación con el segundo planteamiento del acusado, el tribunal a quo determinó que la participación del tribunal como custodio de la grabación antes de la presentación de una acusación formal "tiene el efecto de convertir al juez

en testigo del pueblo para establecer la cadena de custodia en relación con la grabación", y que este esquema viola la separación de poderes porque obliga al juez a recibir una grabación que le entrega un representante del Poder Ejecutivo, sin que pueda pasar juicio sobre la autenticidad, confiabilidad e integridad de ésta, y convierte al juez en una herramienta de la función investigativa del Estado.

La Sec. 6 de la referida ley dispone, en lo pertinente, 25 L.P.R.A. sec. 971q(i), que:

> (i) Toda grabación de una comunicación oral efectuada de conformidad con lo dispuesto en esta sección deberá hacerse de forma tal que se evite que la misma sea editada o alterada.
>
> Inmediatamente después de que se haya grabado una comunicación oral, el original de tal grabación deberá entregarse al juez que haya emitido la orden autorizando la misma para sellarse según las instrucciones que éste emita al respecto. Asimismo, dicho juez dispondrá todo lo relativo a la conservación y custodia de dicha grabación por el tribunal. Las grabaciones realizadas de acuerdo a lo dispuesto en esta sección deberán conservarse por un término de diez (10) años, excepto cuando el juez que haya emitido o denegado la orden disponga su destrucción. A los efectos de la investigación o preparación de un juicio, se podrán hacer duplicados de una grabación. La condición de que la grabación esté sellada, según dispuesto en este inciso, o una explicación satisfactoria al tribunal de la razón o razones por la cual no está sellada tal grabación, será un requisito para permitir la presentación de la misma como evidencia en cualquier procedimiento judicial o de cualquier otra naturaleza. El Tribunal Supremo de Puerto Rico adoptará dentro de seis (6) meses siguientes a la aprobación de esta ley las reglas que sean necesarias respecto del procedimiento de sellar, conservar y custodiar judicialmente tales grabaciones para darle efectividad a lo dispuesto en este inciso.

Respecto del referido procedimiento, en el Informe de la Comisión de lo Jurídico Penal de la Cámara de Representantes, *supra*, págs. 21–22, se explicó lo siguiente:

> Por otro lado, dada la naturaleza de los delitos, entendemos que el proceso debe ser uno hermético, donde el menor número de personas intervenga, ya que no sólo va en juego la pérdida

de evidencia, sino la vida de los agentes e informantes, es por esto que se establece en la medida que de ser expedida la autorización solicitada el Tribunal ordenará que el expediente sea sellado ....

En adición queremos señalar que los tribunales tienen plena discreción, según se ha decidido en la jurisdicción federal, para admitir o rechazar las grabaciones que sean obtenidas en el proceso investigativo. [Citas omitidas.] El peso de la prueba para demostrar que las grabaciones deben ser admitidas y que éstas son auténticas y confiables, recae en el Pueblo. ...

Demostrar la autenticidad de la grabación de por sí no es suficiente. El Pueblo tendría, además, el peso de introducir evidencia demostrativa de que la grabación reproduce con certeza la conversación grabada. Se tiene que demostrar la competencia del operador, la fidelidad del equipo de grabación, la ausencia de alteraciones y la identidad de las voces más importantes.

Estas expresiones revelan que la intención legislativa fue primordialmente asegurar la confidencialidad de las grabaciones, por la naturaleza del crimen investigado, para proteger no sólo la pureza del proceso, sino también la seguridad de los agentes involucrados.[24]

◼◼◼ Conforme con esta disposición, nosotros, en nuestra función reglamentaria, adoptamos las "Reglas para Sellar, Conservar y Custodiar Judicialmente los Documentos y Grabaciones de Comunicaciones Orales No Telefónicas". *Reglas del Tribunal Supremo*, supra. La Regla 2.6(b), *supra*, pág. 131, provee, en lo pertinente, lo siguiente:

---

[24] Esta interpretación es cónsona con la que se ha hecho de la disposición federal sobre los requisitos de sellar las grabaciones y custodiarlas de acuerdo con la discreción del juez que autorice la grabación. 18 U.S.C. sec. 2518(8). Véanse: *McMillan v. United States*, 558 F.2d 877 (8vo Cir. 1977); *United States v. Falcone*, 505 F.2d 478 (3er Cir. 1974), *cert.* denegado, 420 U.S. 955 (1975); *United States v. Florea*, 541 F.2d 568 (6to Cir. 1976), *cert.* denegado, 430 U.S. 945 (1977), *reh. denegada*, 431 U.S. 925 (1977); *United States v. Kohne*, 485 F.2d 682 (3er Cir. 1973), *aff'd*, 487 F.2d 1395 (3er Cir. 1973), *cert.* denegado, 417 U.S. 918 (1974); *United States v. Mendoza*, 574 F.2d 1373 (5to Cir. 1978), *reh. denegada,* 579 F.2d 644 (5to Cir. 1978); *cert.* denegado, 439 U.S. 988 (1978).

Esto puede ser particularmente útil en casos como el de marras, en que la grabación contiene material incriminatorio respecto de un fiscal, funcionario que usualmente tiene mayor accesibilidad a este tipo de información privilegiada.

(b) Acto de entrega de la grabación

El procedimiento que regirá la entrega de la susodicha grabación será el siguiente:

1. El Juez se cerciorará de que el funcionario autorizado acompañe dicha grabación con una certificación por escrito que señalará: número de control del caso, nombre de la persona o personas grabadas, fecha de la última comunicación oral grabada, número de comunicaciones grabadas que forman parte de la grabación, identificadas en orden cronológico, fecha y hora de la entrega, y nombre y firma del funcionario autorizado que hace la entrega.

2. La grabación y la certificación se pondrán en un sobre o sobres —en caso de consistir en más de una cinta magnetofónica y el material en que se hayan registrado los sonidos que contiene la grabación— que el Juez sellará en presencia del funcionario judicial autorizado que hace la entrega. Ambos firmarán dicho sobre o sobres y dejarán constancia de la fecha y hora de la entrega.

3. El Juez ordenará la custodia y conservación de la grabación.

4. En este mismo acto, el Juez o funcionario judicial procederá a entrar en el libro de registro las especificaciones que señala la Regla 2.5.

Por su parte, la Regla 2.2, *supra*, pág. 128, provee que, una vez sellada, "el Juez dispondrá de la custodia mediante orden escrita y levantará acta al efecto, que junto con los documentos y grabaciones formará el expediente judicial".

Como vemos, pues, los deberes impuestos a los jueces por la ley y por el Reglamento son únicamente de carácter *ministerial* respecto del recibo de la grabación y la orden a los correspondientes funcionarios del tribunal para que se custodie,[25] cuyo cumplimiento constará debidamente en un acta. Ni la ley ni el reglamento imponen al juez mismo el deber de custodiar físicamente la grabación.

La resolución emitida por este Tribunal para adoptar las reglas referidas nada dispone sobre la validez constitu-

---

[25] El juez también tiene otros deberes respecto de la grabación una vez custodiada, incluyendo la autorización para ser copiada.

cional de la disposición estatutaria aludida. Hoy nos toca expresarnos por primera vez sobre esta cuestión, atendiendo particularmente los planteamientos del acusado en relación con la cadena de custodia y la autenticación de la grabación en el correspondiente proceso criminal posterior.

■ La Regla 75 de Evidencia, 32 L.P.R.A. Ap. IV, exige que la prueba que se vaya a presentar en evidencia sea autenticada o identificada a satisfacción del tribunal previo a su presentación, de acuerdo con las disposiciones de la Regla 9(B) de Evidencia, 32 L.P.R.A. Ap. IV. No exige que se autentique la prueba mediante un método específico, sino que se tiene que presentar "evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que el proponente sostiene". Regla 75 de Evidencia, *supra*.

■ El contenido de las grabaciones puede ser admitido como evidencia mediante testimonio o admisión de la parte contra quien se ofrece, sin necesidad de producir el original. Reglas 74 y 75(G) de Evidencia, 32 L.P.R.A. Ap. IV. De otro modo, las grabaciones electrónicas o mecánicas pueden ser autenticadas para ser admitidas como prueba mediante la identificación de la voz, por una opinión formada a base de familiaridad con la voz, Regla 75(B) de Evidencia, 32 L.P.R.A. Ap. IV, y conforme con lo que dijimos en *Pueblo v. Hernández Santiago*, 97 D.P.R. 522, 535–536 (1969), respecto de la admisibilidad de las grabaciones. Allí resolvimos que:

Para que estas grabaciones sean admisibles en evidencia deben ser debidamente tomadas, identificadas, y autenticadas como una reproducción fiel y correcta de las manifestaciones proferidas. [Citas omitidas.] A estos efectos debe demostrarse: (1) que la máquina grabadora era capaz de tomar el testimonio; (2) que el operador de la máquina era competente para operarla; (3) que la grabación es auténtica y correcta; (4) que no se han hecho cambios, adiciones o eliminaciones a la grabación; (5) la forma en que ha sido conservada la grabación; (6) la iden-

tificación de las personas que hablan en la grabación; y (7) que el testimonio se produjo libre y voluntariamente.

La cadena de custodia es un método permitido de autenticación de evidencia que nuestra jurisprudencia ha reconocido que es esencial para toda prueba que no sea susceptible de ser marcada y toda prueba que no sea susceptible de ser reconocida por sus signos exteriores. *Pueblo v. Carrasquillo Morales*, 123 D.P.R. 690 (1989); *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986). Es decir, que se tiene que identificar la cadena de custodia *siempre* para toda evidencia que sea fungible o aquella que, siendo susceptible de ser marcada, no se haya marcado; como por ejemplo, líquidos, polvos, píldoras. En estos casos se tiene que establecer la cadena de custodia, explicando el paradero de la pieza desde su ubicación hasta su presentación en corte, para que exista correspondencia entre lo que se presenta y el acusado, y se determine así su pertinencia al caso criminal.

En el caso de grabaciones, la cadena de custodia es importante, no para establecer su pertinencia —cuestión claramente establecida por el contenido de la grabación y la debida identificación de las voces— sino para establecer la confiabilidad de su condición o estado, en casos en que exista la posibilidad de que haya sido alterada. *Pueblo v. Carrasquillo Morales*, supra, pág. 701. En estos casos, para que sea admisible en evidencia la grabación, el proponente sólo tiene que convencer al tribunal de que no ha habido ninguna anormalidad que haya afectado la custodia de la evidencia. *Pueblo v. Bianchi Álvarez*, supra, pág. 492. Una vez el proponente de la evidencia cumpla con este requisito preliminar, cualquier duda que surja respecto de la posible adulteración o contaminación de la evidencia, se dirige al peso y no a la admisibilidad de la evidencia. *Íd.*

En la situación contemplada por la ley, contrario

a lo alegado por el peticionario, no nos parece indispensable la intervención del juez como testigo para establecer la cadena de custodia. La participación del juez en el manejo de la grabación está limitada a: (1) sellarla dentro de un sobre, identificándola como aquella entregada por el funcionario correspondiente, acto que únicamente establece la entrega y no la naturaleza o la autenticidad de lo entregado; (2) la disposición de su custodia, que únicamente se refiere a cómo debe llevarse a cabo y no implica la supervisión o el conocimiento de cómo en efecto se llevó a cabo por los funcionarios del tribunal asignados a ello, y (3) la expedición de órdenes para que sea copiada o destruida, pero no así el manejo de dichas acciones. Todo ello, además, constará por escrito en documentos oficiales que formarán parte del expediente judicial en particular. Aun de ser necesario el testimonio del juez, sujeto a las disposiciones de la Regla 41 de Evidencia, 32 L.P.R.A. Ap. IV, nada de lo que éste pudiera testificar respecto de esos particulares relevaría al Ministerio Público de su tarea de demostrar la autenticidad y confiabilidad de la correspondiente grabación, ni le impediría al acusado presentar prueba testifical o científica respecto de la probabilidad de alteración de la grabación.

■ Por otro lado, no debemos olvidar que el propósito principal de la ley es regular la actuación del Poder Ejecutivo durante la etapa investigativa en relación con el crimen organizado para asegurar la razonabilidad del registro. Nada dispone ésta propiamente sobre el inicio o desarrollo del procedimiento criminal posterior. Salvo las disposiciones en el procedimiento judicial *ex parte* sobre la entrega de la grabación al tribunal para que éste la selle, conserve y custodie —disposiciones que claramente tienen el sólo propósito de evitar que las grabaciones sean alteradas o editadas y mantener su confiabilidad— la ley nada dispone sobre las exigencias evidenciarias en el juicio correspondiente. Este mecanismo de custodia, pues, no

puede tener el efecto de obligar de manera alguna al juez en relación con la posterior adjudicación de la autenticidad de la grabación y su admisibilidad en evidencia. En cuanto a éstas, existe una autonomía y prerrogativa absoluta de la Rama Judicial. Nada de lo dispuesto en la referida ley tiene el efecto de limitar la función esencialísima del juez de determinar la autenticidad de la evidencia que se presente en un procedimiento criminal, caso a caso.

Históricamente, el registro y la incautación de material incriminatorio han sido funciones compartidas por la Rama Judicial y la Rama Ejecutiva. Por imperativo constitucional, la Rama Ejecutiva es quien investiga e interesa la incautación del material delictivo; también por imperativo constitucional son los tribunales quienes tienen la potestad de autorizar y examinar la validez de los registros. El manejo y la custodia de evidencia también ha sido históricamente una función compartida de los funcionarios del Departamento de Justicia o la Policía y los tribunales. La interacción de estas ramas es esencial e indispensable al sistema de enjuiciamiento criminal en nuestro país. El acusado no cuestiona esto. Lo que objeta es la custodia por parte del tribunal en una etapa previa al inicio del proceso criminal. No consideramos que ello, por sí sólo, sea una participación indebida de la Rama Judicial en la función investigativa que le corresponde al Poder Ejecutivo. Nótese que la grabación así custodiada se convierte en parte del expediente judicial, expediente que corresponde al procedimiento *ex parte* de la solicitud y expedición de la orden, cuya validez es incuestionable y el cual debe ser administrado por los tribunales. Esto implica que las actuaciones investigativas del Gobierno ya habían sido avaladas por los tribunales, requiriendo así la participación del tribunal desde ese momento a través de unos mecanismos separados de la maquinaria investigativa del Poder Ejecutivo, regidos por criterios independientes y distintos de los que rigen las actuaciones del Ejecutivo.

Por todo ello, resolvemos que el mecanismo dispuesto en la Ley Núm. 36, *supra,* no presenta trabas significativas a nuestro sistema de justicia, cuya implementación, como hemos visto, necesariamente requiere la participación igual e independiente de ambas Ramas: la Ejecutiva y la Judicial. No existe aquí una situación que viole el principio de la separación de poderes.

## VII

Por último, atendemos el planteamiento del acusado de que la grabación debe ser suprimida porque el Ministerio Público le imputó un delito incorrecto en derecho para aprovecharse indebidamente de la Ley Contra el Crimen Organizado.

En esencia, el acusado alega que el Ministerio Público le imputó el delito de extorsión en la solicitud de autorización judicial para grabar y luego el de soborno agravado en las acusaciones porque éstos estaban comprendidos dentro de los delitos relacionados al crimen organizado en la Ley Núm. 36, *supra,* en vez de imputarle el delito de influencia indebida, que es el que el acusado entiende estaba apoyado por los hechos relatados en las acusaciones y para el cual no estaba disponible el mecanismo de la ley. Por ello, el acusado entiende que la grabación de la conversación fue ilegal y debe ser suprimida, según lo dispone la propia ley.

Los Arts. 209 y 210 del Código Penal de Puerto Rico, 33 L.P.R.A. secs. 4360 y 4361, respectivamente, disponen, en lo pertinente, lo siguiente:

*Soborno*
Todo funcionario o empleado público, o jurado, o árbitro, o cualquier persona autorizada en ley para oír ó resolver alguna cuestión o controversia, que solicite o reciba, directamente o por persona intermedia, para sí o para un tercero, dinero o cualquier beneficio, o aceptare una proposición en tal sentido, por realizar un acto regular de su cargo o función, será sancionado

con pena de reclusión por un término fijo de nueve (9) años. ...

*Delito agravado*

Si el funcionario o empleado público o jurado o árbitro, o la persona autorizada en ley para oír o resolver una cuestión o controversia, solicitare, o recibiere el dinero, o el beneficio, o aceptare la promesa, *por omitir o retardar un acto regular de sus funciones o por ejecutar un acto contrario al cumplimiento regular de sus deberes,* o con el entendido o en la inteligencia de que tal remuneración o beneficio habrá de influir en cualquier acto, decisión, voto o dictamen de dicha persona en su carácter oficial, la pena de reclusión será por término fijo de doce (12) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de ocho (8) años.[26] (Énfasis suplido.)

En *Pueblo v. Carballosa y Balzac,* supra, pág. 850, dijimos que para que se configure el delito de soborno no hay que probar que el funcionario tenía la autoridad final en la cadena de eventos sino, por el contrario, que es suficiente en derecho que el acto al que esté relacionado el soborno " 'esté comprendido entre los deberes generales del empleado según descritos en su nombramiento y conforme a las tareas que [normalmente] realiza' ". Véase, además, *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748, 759 (1985).

Por otro lado, el Art. 213 del Código Penal, 33 L.P.R.A. sec. 4364, el cual trata sobre el delito de influencia indebida, establece, en lo pertinente, que será ilegal para una persona

... que obtuviere o tratare de obtener de otra cualquier beneficio asegurando o pretendiendo que se halla en aptitud de influir en cualquier forma en la conducta de un funcionario o empleado público en lo que respecta al ejercicio de sus funciones ....

Este delito claramente está dirigido a la intromisión in-

---

[26] Los funcionarios o empleados públicos convictos según estas secciones no podrán obtener el beneficio de sentencia suspendida y de libertad a prueba. 34 L.P.R.A. sec. 1027.

debida de un tercero con los deberes de un funcionario público, o sea, de persona ajena al desempeño de esas funciones. En *Pueblo v. Luzón*, supra, pág. 320, dijimos que el estatuto "penaliza el tratar o lograr un beneficio por pretender ejercer una influencia —real o imaginaria— en cualquier forma en la conducta de un funcionario, en lo que respecta al ejercicio de sus funciones".

Lo determinativo, pues, en el caso de autos es si la promesa alegadamente hecha por el acusado a terceras personas era para hacer algo en contra de sus propios deberes o si era para influir en la conducta de otros funcionarios públicos.

La teoría del acusado es que ni el caso de drogas relacionado a Pagán San Miguel ni la investigación del asesinato de Casiano Zapata eran de la jurisdicción de la Fiscalía de Ponce a la que estaba adscrito cuando alegadamente sucedieron los hechos, sino de la jurisdicción de la Fiscalía de Mayagüez, por lo que los hechos por los cuales se le acusó no estaban relacionados al desempeño de un acto regular de sus funciones. No tiene razón.

La ley dispone que "[s]erá el deber de cada Fiscal el procesar a todos los delincuentes por crímenes y delitos de que pueda conocer bajo la autoridad del Estado Libre Asociado de Puerto Rico". 3 L.P.R.A. sec. 95. De ahí surge claramente que un fiscal está obligado, entre otras cosas, a velar por el fiel cumplimiento de las leyes penales *en toda la Isla*, independientemente de la jurisdicción a la que haya sido asignado, y a hacer todo lo que pueda para lograr que se procese a un delincuente, irrespectivamente de que tenga la investigación a su cargo o no.

En una sociedad como la nuestra, de tan fácil movilización entre pueblos, para combatir el crimen eficientemente se requiere la pronta colaboración de todos los fiscales en todo momento. Su fiel participación en la investigación y el enjuiciamiento de la actividad criminal es parte esencial de los deberes de su cargo como funcionario

del Departamento de Justicia. Impedir el formulamiento de cargos o la ejecución de penas, multas o sanciones que resulten de una convicción, constituyen indudablemente una omisión de un acto regular de sus funciones o un acto contrario al fiel cumplimiento de sus deberes. No constituye, como alega el acusado, una interferencia con la labor de otro.

Resolvemos, pues, que a base de los hechos descritos en las acusaciones presentadas contra Santiago Feliciano, el Ministerio Público correctamente le imputó el delito de soborno agravado.

## VIII

Antes de concluir esta opinión, es menester hacer un señalamiento adicional, de orden general, sobre la cuestión medular que tenemos ante nos y la función de este Tribunal.

Ninguna encomienda de este Foro es de mayor importancia que la de salvaguardar y proteger los derechos fundamentales de las personas, entre ellos el que cobija la preciada intimidad de todo ser humano. Nuestra labor, sin embargo, es la de mantener y defender *todos* los derechos fundamentales de las personas, incluyendo también el derecho de la gente a una vida segura, a que no se les viole su integridad física y a que se respete su propiedad.

De más está decir que el país sufre angustiosamente los estragos de una desenfrenada violencia y de un interminable pillaje causados por la plaga virulenta del crimen, que nos aflige desde hace ya demasiado tiempo y que crece incontrolablemente cada día más. Esta trágica experiencia —que la inmensa mayoría de los ciudadanos considera nuestro principal problema colectivo— causa un hondo desasosiego, un justificado pavor y una desconcertante inseguridad, que permean la vida familiar cotidiana de casi todos los puertorriqueños.

Frente a esta desgraciada realidad, no podemos desautorizar los esfuerzos de las ramas políticas para lidiar con la criminalidad sólo porque nos parezcan arriesgados o porque no reflejen idealmente lo que creemos que debe ser el curso de acción más acertado. Nuestro rol se limita a asegurarnos de que las medidas tomadas cumplan con las exigencias constitucionales pertinentes. Dicho de otra forma, cuando, como ocurre en este caso, se contraponen dramáticamente derechos e intereses estatales de la mayor jerarquía, nuestra labor es la de armonizar lo que está contrapuesto. No es la de favorecer unos a costa de otros.

La ley que tenemos ante nos es, sin duda, controversial. Sin embargo, tiene suficientes garantías, sobre todo del modo que la hemos interpretado, para salvaguardar en lo esencial el fundamental derecho a la intimidad de los que puedan verse afectados por ella. Por eso, declarar su inconstitucionalidad, como algunos pretenden, sería realmente un grave abuso de nuestra función de revisión judicial y un acto de patente insensibilidad frente al terrible problema de la criminalidad que sufre el país y frente al miedo y la desesperanza que padece la gente por razón de éste.

Es menester reiterar aquí lo que en numerosas ocasiones hemos señalado en nuestra doctrina sobre agentes encubiertos: la ley en cuestión es un arma de investigación que se estima necesaria para la persecución eficaz de ciertos delitos que, por su característica esencial de clandestinidad, de otro modo permanecerían impunes, si no se contara con este modo de investigación.

Por la naturaleza excepcional de la ley, sin embargo, las peticiones de autorización judicial deben ser examinadas con el mayor rigor y cuidado por los tribunales. Es mediante la supervisión judicial esmerada que se logra el debido y difícil balance entre los valores en juego. Este Tribunal en particular estará alerta y someterá a cuidadoso escrutinio la utilización de la ley de marras, para asegurar

la pureza de los procedimientos. *Pueblo v. Álamo Álamo*, 116 D.P.R. 673 (1985); *Pueblo v. Almodóvar*, 109 D.P.R. 117 (1979); *Pueblo v. Soto Zaragoza*, 94 D.P.R. 350 (1967); *Pueblo v. Seda*, 82 D.P.R. 719 (1961).

## IX

En resumen, resolvemos hoy que la ley que autoriza la grabación de conversaciones no telefónicas en relación con actividades ligadas al crimen organizado mediante una orden judicial, según la hemos interpretado aquí, no adolece esencialmente de vicios constitucionales. El mecanismo dispuesto en la Sec. 6 de la Ley Núm. 36, *supra*, cumple esencialmente con los requisitos de las Secs. 8 y 10 del Art. II de nuestra Constitución, *supra*, y no viola el principio de la separación de poderes.

No examinamos hoy la validez constitucional de la disposición que autoriza la grabación sin una orden judicial previa.

Resolvemos, además, que en este caso se imputó correctamente el delito de soborno agravado, por lo que de probarse que se cumplió esencialmente con el mecanismo dispuesto en la Ley Núm. 36, *supra*, procede la admisión de la grabación en evidencia en el juicio criminal contra Santiago Feliciano, conforme a las Reglas de Evidencia.[27]

Por los fundamentos expuestos, *se dictará sentencia para revocar la del Tribunal Superior, Sala de Ponce, de 27 de marzo de 1993.*

Los Jueces Asociados Señores Rebollo López y Hernández Denton emitieron sendas opiniones disidentes.

---

[27] Por el resultado al que llegamos hoy, no es necesario tampoco en esta ocasión entrar a resolver el planteamiento relacionado al registro de "buena fe" que dejamos sin resolver en *Pueblo v. Muñoz, Colón y Ocasio*, supra.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La *fe* de este pueblo en su Sistema de Justicia —en especial, en los *integrantes* del mismo— es *esencial* al mantenimiento y permanencia de su sistema democrático de gobierno. Esto es, el día que los ciudadanos de este País pierdan la fe, o duden, de la honestidad, integridad y honradez de los funcionarios que integran dicho Sistema de Justicia, éstos probablemente dejarán de obedecer y cumplir las leyes que rigen nuestras vidas y posiblemente empezarán a tomar la Justicia "en sus propias manos"; situación que, naturalmente, desembocará en el caos y la anarquía.

Es por ello que el caso que hoy ocupa la atención de los integrantes de este Tribunal *resulta ser de trascendental importancia*. En el mismo está en "tela de juicio" no sólo la honestidad y honradez de uno de los integrantes principales de ese Sistema de Justicia, un fiscal del Departamento de Justicia de Puerto Rico, sino que la del sistema mismo. El mero pensar que los hechos imputádoles a ese funcionario puedan ser ciertos causa un gran desasosiego y desconcierto en nuestra mente y un natural sentimiento de incredulidad.

Es por ello que, entre otras razones, *suscribimos en principio la acción legislativa y/o del Estado* de establecer mecanismos que le permitan combatir, *en general*, la ola criminal que azota nuestro País y, *en especial*, esta clase de corrupción gubernamental, *mediante la aprobación de legislación que permita la grabación de conversaciones no telefónicas en ésta, y otras, clase de situaciones delictivas*. Ello permite, en particular y en lo pertinente, no sólo que se puedan descubrir, y procesar criminalmente, a funcionarios alegadamente corruptos, *utilizando para ello la mejor evidencia posible*, sino que desaparezca, como por arte de

magia, la natural incredulidad que nos causa la información de que un funcionario público, como el aquí imputado, ha desgraciado no sólo su reputación sino que la del sistema al cual pertenece.

Las disposiciones pertinentes de la Constitución del Estado Libre Asociado de Puerto Rico *no* constituyen, *en principio*, obstáculo alguno para la acción legislativa a estos efectos. Erró, *ciertamente*, el tribunal de instancia al así decidir. Aparte del hecho de que nuestra Constitución es una inherentemente dinámica y cambiante, *venimos en la obligación de interpretar la misma en la forma más conveniente al bienestar general de nuestra ciudadanía.* Esto es, en esta encomienda, *no* nos podemos limitar meramente a leer dicho histórico documento. *Por otro lado*, constituiría un *absurdo* conceder protección, al amparo de las disposiciones del Art. 145 del vigente Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4186, *a conversaciones referentes a la comisión de hechos delictivos.*

Ello no significa, *sin embargo*, que estamos autorizados para hacer caso omiso de las *expresas disposiciones* de nuestro ordenamiento jurídico. *Debe mantenerse presente que este Tribunal es el primero que viene en la obligación de actuar conforme dispone la Constitución y las leyes del Estado Libre Asociado de Puerto Rico.* Esto es, *no* podemos exigirle a ciudadano alguno que observe y cumpla con lo requerido por nuestro ordenamiento cuando nosotros somos los primeros en no hacerlo.

En el día de hoy, y no obstante el *loable propósito* que persigue el Tribunal de sostener la facultad del Estado de grabar conversaciones *no* telefónicas relativas a actividades delictivas, este Foro incurre en el *lamentable error* de obviar y echar a un lado garantías constitucionales básicas que fueron promulgadas, *precisamente*, en protección de esa misma ciudadanía. *En adición*, la mayoría incurre en error al concluir que le son aplicables a los hechos de este caso unos artículos del vigente Código Penal de Puerto

Rico que, *realmente,* no lo son. Es por ello que nos vemos imposibilitados de suscribir la opinión mayoritaria emitida por el Tribunal en el presente caso.

## I

Como es sabido, la Sec. 10 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 299, establece que:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> *Sólo* se expedirán mandamientos autorizando registros, allanamientos o arrestos *por autoridad judicial,* y ello *únicamente cuando exista causa probable apoyada en juramento o afirmación,* describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> *Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.* (Énfasis suplido.)

Al momento de redactarse esta disposición constitucional —*la cual este Tribunal no puede meramente limitarse a leer sino que viene obligado a interpretar correctamente*— quedó plasmado en el Diario de Sesiones de la Convención Constituyente el *interés* de que nuestra Carta de Derechos *no* fuera una que cumpliera en forma mínima con los requisitos impuestos por la Ley Núm. 600,[1] *sino que,* por el contrario, *se tratara de una de las cartas de derechos más liberales, más generosas y más auténticamente democráticas del mundo.*[2]

Es así como se llega a la conclusión de que:

> *La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma.* El hogar,

---

[1] Ley Pública Núm. 600, 3 de julio de 1950, Cap. 446, 64 Stat. 931.

[2] 2 Diario de Sesiones de la Convención Constituyente 1106 (1951).

los muebles y utensilios, los libros y papeles poseídos por un ciudadano son como una prolongación de su persona, pues constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda intromisión sin su permiso en ese círculo privado equivale para todo hombre a una violación de su personalidad. ... *La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona.*[3] (Énfasis suplido.)

Conscientes, sin embargo, los miembros de la Convención Constituyente de que en toda democracia hay personas que no están en disposición de respetar las leyes que se aprueban en beneficio de todos, lo que causa una "confrontación" entre el interés común y el estrictamente personal, *los Constituyentes claramente establecieron que la inviolabilidad de esos derechos personales fundamentales tendría su límite en la conducta criminal de los ciudadanos.* En consecuencia, tomaron providencias para que nuestro pueblo pudiera combatir efectivamente la conducta criminal de algunos de sus ciudadanos. Entre otros, se proveyó para la expedición de órdenes de arresto y de registro y allanamiento. *Ahora bien, se estableció como salvaguarda que dichas órdenes únicamente serían procedentes en derecho cuando mediara, a juicio de un magistrado, "causa probable" para expedir las mismas y dicha determinación estuviera "apoyada en juramento o afirmación".*

Del debate referente a la transcrita Sec. 10 se desprende, con meridiana claridad, *que la intención de la Asamblea Constituyente fue que se concediera el poder de expedir esas órdenes de arresto y de registro y allanamiento, con carácter de exclusividad, a la autoridad judicial; privándose, expresamente, de esa facultad a los funcionarios del Departamento de Justicia y, ciertamente y con mayor razón, a los miembros de la Policía de Puerto Rico.*

---

[3] Diario de Sesiones, *supra*, Vol. 4, pág. 2567.

## II

Es por ello que *no* podemos suscribir, *en primer lugar*, el trágico y lamentable error que comete el Tribunal al sostener la constitucionalidad de la Ley Núm. 36 de 19 de junio de 1987 (en adelante Ley Núm. 36), 25 L.P.R.A. sec. 971 *et seq.*, pasando por alto y haciendo caso omiso la mayoría, al así hacerlo, de unas *omisiones y lagunas* existentes en la referida Ley Núm. 36 que hacen que ésta sea *claramente* inconstitucional. Nos referimos, entre otros, al *esquema ilegal* mediante el cual se sitúa al Poder Judicial en un *plano de inferioridad* frente al Poder Ejecutivo, a la *ausencia total de requerimiento*, por parte de la citada Ley Núm. 36, de que el "peticionario" de la orden de grabación tenga que *comparecer personalmente* ante el magistrado, *y que la declaración del peticionario tenga que ser juramentada*; fallas constitucionales que el Tribunal, de manera sorprendente, califica como "deficiencias que, aunque importantes, *son subsanables*, y que no justifican invalidar *in toto* la legislación ante nos". (Énfasis suplido.)

Meramente a manera de ejemplo, llamamos la atención hacia las disposiciones del inciso (d) del Art. 18 de la citada Ley Núm. 36. El mismo dispone:

(d) Toda petición del Secretario de Justicia para obtener una orden judicial de autorización para grabar una comunicación oral deberá hacerse por escrito, estar firmada por el Secretario e incluir lo siguiente:

(1) *Una relación de los hechos que dan base a su determinación de motivo fundado de que la persona se dedica a, o participa en cualquier actividad del crimen organizado*, según tal término se define en esta ley, establecer el patrón de actividad de crimen organizado y que una comunicación oral relacionada al crimen organizado será obtenida de la grabación que se interesa.

(2) El tipo de artefacto o mecanismo de grabación a ser utilizado.

(3) El tiempo estimado necesario para la investigación durante el cual se grabarán comunicaciones orales.

(4) El nombre de la persona o personas cuyas comunicaciones orales serán grabadas y su relación con el asunto objeto de la investigación. (Énfasis suplido.) 25 L.P.R.A. sec. 971q(d).

*Como podemos notar*, la actuación del juez autorizando la grabación de la conversación podrá ser hecha por éste a base de una *relación* de hechos, *no jurada*, preparada por el Secretario de Justicia, que *a juicio de este funcionario* constituye motivo fundado para concluir que la persona allí mencionada se dedica o participa en una actividad del crimen organizado. *En otras palabras*, el estatuto *no* requiere *ni* que el peticionario de la orden de grabación comparezca personalmente ante el magistrado *ni* que su declaración sea jurada. Aparte de ello, *lo cual es suficiente para decretar la inconstitucionalidad del estatuto en controversia*, dicha legislación contempla la actuación del magistrado *como una meramente mecánica*.

Que ello es así, esto es, que lo que la citada ley estima como determinante lo es el juicio, o determinación, del Secretario de Justicia —*y no el del juez*— lo demuestra el hecho de que el Art. 18(c)(1) de la citada Ley Núm. 36 (25 L.P.R.A. sec. 971q(c)) autoriza al Secretario a proseguir adelante con la grabación sin la autorización de un magistrado en una serie de situaciones, *entre otras*, si sus gestiones para localizar al juez designado resultan "infructuosas"; situación que todo jurista viene en la obligación de rechazar de manera vehemente.

La inconstitucionalidad de la situación antes expuesta es tan *patente y manifiesta* que somos del criterio que resulta innecesario que nos extendamos mucho en su discusión. Basta recordar lo dispuesto por la Sec. 10 del Art. II de nuestra Constitución, *supra*, a los efectos de que sólo se expedirán esta clase de órdenes "por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación", y que la orden autorizando la grabación de una conversación *no* telefónica, fundamentada la misma en la existencia de "motivo fun-

dado de que una persona se dedica o está envuelta en un patrón de actividad del crimen organizado",(4) es de la *misma naturaleza* que las órdenes judiciales que se expiden autorizando registros y allanamientos; *esto es, ambas son órdenes que interfieren con la "persona" o el derecho a la intimidad de ésta.*(5)

En relación con esta clase de órdenes, *la posición de este Tribunal siempre había sido otra,* esto es, diametralmente distinta a la hoy asumida por la mayoría de los integrantes del Tribunal. En fecha tan reciente como febrero de 1988 expresamos —en *Pueblo v. Malavé González,* 120 D.P.R. 470, 474 (1988)— que a los fines de garantizar el cumplimiento del mandato constitucional contra registros y allanamientos ilegales e irrazonables *"se interpuso la figura independiente e imparcial del juez* entre los agentes del orden público y los ciudadanos. ... Corresponde al magistrado hacer el *delicado balance* entre los derechos del ciudadano y las necesidades del Estado de investigar agresivamente los delitos cometidos". (Énfasis suplido.)

En esa misma fecha —en *Pueblo v. Martínez Torres,* 120 D.P.R. 496, 500–501 (1988)— afirmamos que la citada disposición constitucional

> ... tiene *tres* objetivos básicos: *"proteger la intimidad y dignidad de los seres humanos,* amparar sus documentos y otras pertenencias *e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión* ...". ... Al enfrentarnos a ese dilema [del conflicto entre el interés público en combatir la criminalidad y los derechos individuales], *debemos tener presente y ser conscientes de que en el menoscabo de las garantías constitucionales, ... no está la verdadera solución al problema de la criminalidad.* Debe tenerse particular cuidado para que a través del proceso adjudicativo de controversias no se ocasione

---

(4) Véase Sec. 6 de la Ley Núm. 36 de 1987 (25 L.P.R.A. sec. 971q).

(5) *A estos efectos,* debe recordarse que reiteradamente hemos resuelto que "motivo fundado" es equivalente, o sinónimo, de "causa probable". *Pueblo v. Díaz Díaz,* 106 D.P.R. 348 (1977); *Pueblo v. Martínez Torres,* 120 D.P.R. 496 (1988); *Pueblo v. Ruiz Bosch,* 127 D.P.R. 762 (1991).

una *lamentable erosión* de los derechos garantizados por nuestra Constitución. (Énfasis suplido.)

Somos del criterio que ciertamente *no* cumple con el mandato constitucional, *ni* con esta visión jurisprudencial anterior del mismo, un estatuto que, en relación con esta clase de órdenes, *relega a un segundo plano al foro judicial, permitiendo, inclusive, que el criterio del incumbente de turno en el Departamento de Justicia sea el que prevalezca*; situación que —*cuando consideramos la pobre calidad, y la inclinación a actuar políticamente, de varios de los últimos incumbentes del cargo de Secretario de Justicia*— resulta ser extremadamente peligrosa.

*Estas graves y fundamentales deficiencias constitucionales no pueden ser "subsanadas", de un "plumazo", por este Tribunal*. Esa *no* es nuestra función. *No* somos una "super legislatura". En el presente caso este Tribunal se debió limitar a declarar inconstitucional la citada Ley Núm. 36, a señalar las razones o fundamentos en apoyo de dicha determinación, y a esperar por la acción, *correctiva y responsable*, de la Asamblea Legislativa de Puerto Rico.

### III

En *segundo* lugar, no podemos endosar la determinación que hace el Tribunal en el presente caso —siguiendo lo resuelto en *Pueblo v. Rivera Rodríguez*, 123 D.P.R. 467 (1989)— a los efectos de que el funcionario del Departamento de Justicia, o el miembro de la Policía de Puerto Rico, que acude ante el juez, en busca de la orden que le permite grabar las supuestas conversaciones delictivas, *no* tiene que declarar ante, y ser *examinado personalmente* por, dicho magistrado, sino que puede hacerlo a través de un escrito que contenga una "relación de hechos". A nuestro juicio, ello contraviene las disposiciones de la antes citada Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*; disposición constitucional

sobre la cual, como certeramente se señala en la opinión mayoritaria, gira la correcta solución de la controversia hoy ante nuestra consideración.

Esto es, a nuestro humilde entender, resulta *completamente erróneo* que se resuelva que cumple con el mandato constitucional, contenido en la referida Sec. 10, el juez que *meramente* se limita, con anterioridad a firmar y expedir una orden autorizando la grabación de una conversación, a leer la declaración escrita del declarante. El magistrado que así actúa *no* descarga la *importantísima función* que los miembros de la Convención Constituyente tuvieron en mente y le impusieron: la de determinar si existe o no "causa probable" para la expedición de la orden autorizando la "intrusión" en la "persona" objeto de la misma.

Refiriéndose al proceso de expedición de órdenes que "interfieran" con la "intimidad" de un ciudadano, como las de allanamiento, nos señala el profesor LaFave que el mismo "interposes an orderly procedure involving judicial impartiality whereby a neutral and detached magistrate can make *informed and deliberate determinations* on the issue of probable cause". (Énfasis suplido.) W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendament*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, pág. 548.

*Somos del criterio que no resulta posible hacer una "informada y jurídicamente" correcta determinación sobre "causa probable", o "motivo fundado", cuando el juez se limita a leer la declaración que se le trae preparada y cuando no examina al declarante.* Ciertamente *no* se interpone "la figura independiente e imparcial del juez entre los agentes del orden público y los ciudadanos" resolviendo que la labor de ese juez en esta clase de situaciones puede ser una *ministerial y mecánica*, esto es, *circunscribiéndose a leer* una declaración y firmar la orden autorizando la "intrusión". *Entendemos que si ese juez en realidad va a cumplir con el mandato constitucional de la antes citada*

*Sec. 10 del Art. II de nuestra Constitución*, constituyéndose en ese "*delicado balance* entre los derechos del ciudadano y las necesidades del estado de investigar agresivamente los delitos cometidos", *el mismo tiene que ejercer una función activa e inquisitiva antes de expedir esta clase de órdenes.*

*Ello se hace necesario por cuanto no es lo mismo, desde el punto de vista del testigo o agente del orden público, el comparecer ante un juez con una declaración ya previamente preparada sabiendo que no va a ser objeto de interrogatorio por éste a la situación en que acude ante dicho magistrado consciente de que los hechos que plasmó en la declaración jurada serán escudriñados por el mismo.* El hecho de saber que el juez le formulará preguntas respecto al contenido de su declaración *es seguramente el mayor disuasivo a la prestación de declaraciones falsas o estereotipadas* dirigidas a garantizar la obtención de una orden judicial de esta naturaleza. *Haciéndole preguntas incisivas a ese declarante sobre lo expuesto en su declaración escrita, escuchando sus respuestas y formulándole nuevas preguntas sobre ellas, observando la forma y manera en que declara esa persona, etc., es el único método mediante el cual un magistrado puede llegar a la conclusión de si ese declarante está o no diciendo la verdad.* En palabras del procesalista Carnelutti,[6] citadas con aprobación por este Tribunal en *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 947 (1975), "el testigo debe ser oído, y visto, *interrogado* y mirado". (Énfasis suplido.)

No es suficiente, en consecuencia, la *mera* lectura de una declaración para dirimir la credibilidad de un testigo; *la determinación de "causa probable" conlleva necesariamente "un poco más".* Como único se puede garantizar la corrección de la actuación en este procedimiento, repetimos, es *mediante el examen personal del declarante* por parte del magistrado. A nuestro entender, a ello es lo que se refiere, y exige, la Sec. 10 del Art. II de nuestra Consti-

---

[6] Carnelutti, *Rivista di Diritto processuale civile*, 1929.

tución, *supra*, al establecer que *sólo se expedirán mandamientos* autorizando registros y allanamientos *por autoridad judicial*, y "ello únicamente *cuando exista causa probable apoyada en juramento o afirmación*". (Énfasis suplido.) Para lo contrario, esto es, *para meramente leer una declaración* y decidir si la misma contiene o no datos suficientes para expedir una orden de esa naturaleza, realmente *no* se necesita a un magistrado; podría encomendársele dicha labor a un paralegal.

*En resumen*, somos del criterio que: la orden judicial autorizando la grabación de la conversación de una persona, emitida al amparo de las disposiciones de la citada Sec. 6 de la Ley Núm. 36 de 1987, es de la *misma naturaleza* que las órdenes judiciales que se expiden autorizando registros y allanamientos, *esto es, ambas son órdenes que interfieren con la "persona" o el derecho a la intimidad de éstas*; que, en consecuencia, a la orden judicial que se expide, al amparo de la referida Sec. 6 de la Ley Núm. 36 de 1987, autorizando la grabación de conversaciones no telefónicas le "aplica" las disposiciones de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, y que la expedición de dicha orden judicial, autorizando la grabación de una conversación no telefónica, requiere el *examen personal* del declarante por parte del magistrado que expide la misma.

## IV

En *tercer* término, entendemos incorrecta la determinación del Tribunal —realizada, "prematuramente", con el obvio y trasparente propósito de sostener la orden emitida en el presente caso autorizando la grabación— a los efectos de que los hechos delictivos que se le imputan al acusado recurrido configuran el delito de "soborno", tipificado por

los Arts. 209 y 210 del vigente Código Penal,[7] en lugar del delito de "influencia indebida", contemplado por el Art. 213 del referido Código.[8] Claramente, los hechos imputados se refieren a una violación de esta última disposición legal.

*Nadie puede cometer el delito de soborno* —esto es, recibir dinero "por realizar un acto regular de su cargo" y/o "por omitir o retardar un acto regular de sus funciones" o por "ejecutar un acto contrario al cumplimiento regular de sus deberes"— *cuando no está a su alcance el así hacerlo.* El argumento y posición de la mayoría a los efectos de que el acusado recurrido, *como fiscal asignado a la Fiscalía del Distrito Judicial de Ponce,* podía "realizar un acto", "omitir o retardar un acto", o "ejecutar un acto contrario al cumplimiento regular de sus deberes", *que era de la responsabilidad e incumbencia de los fiscales del Distrito Judicial de Mayagüez,* causa consternación en nuestra conciencia judicial por cuanto la misma constituye *una forzada e improcedente interpretación de un estatuto penal en abierta violación al principio de legalidad.*

El Tribunal puede, y debe, tomar conocimiento judicial del hecho de que es *política administrativa* del Departamento de Justicia asignar fiscales a cada distrito judicial y que éstos llevan a cabo sus funciones *únicamente* en el distrito judicial en que han sido designados, siendo necesaria una *nueva designación* por parte del Departamento de Justicia para actuar en otro distrito judicial. Esto es, un fiscal asignado a la Fiscalía del Distrito Judicial de Ponce *no* puede comparecer a la Fiscalía y a la Sala de Mayagüez del Tribunal Superior a intervenir con, o a tramitar, los asuntos criminales allí pendientes *sin* contar con una designación previa a esos efectos.

Dicho de otra forma, el fiscal recurrido, aquí acusado, *no* tenía facultad *ni* autoridad alguna —como tampoco, de he-

[7] 33 L.P.R.A. secs. 4360 y 4361.

[8] 33 L.P.R.A. sec. 4364.

cho, podía hacerlo— para retardar la radicación de un pliego acusatorio en la Sala de Mayagüez del Tribunal Superior *ni*, mucho menos, para impedir que las autoridades federales confiscaran unas propiedades relacionadas con unos casos criminales radicados en el foro federal.

## V

Resulta *verdaderamente sorprendente* que la mayoría de los integrantes del Tribunal, en un intento desesperado por justificar lo injustificable, defienda su erróneo proceder apelando y parapetándose tras el "terrible problema de la criminalidad que sufre el país". Aun cuando admite, de manera cándida e ingenua, que la ley en controversia "es, sin duda, controversial" y que la misma es parte de unos "esfuerzos" llevados a cabo por las ramas políticas de nuestro gobierno con el propósito de lidiar con esa criminalidad que, conforme los califica la propia Mayoría, son "arriesgados", aduce que tiene el deber de sostener la inconstitucionalidad de dicha ley.

En relación con la posición asumida por la mayoría, nos parecen pertinentes y apropiadas unas recientes expresiones nuestras a los efectos de que:

El afán o propósito de proteger a la ciudadanía contra la cruel ola criminal que desgraciadamente azota a nuestra Isla *no* puede servir de excusa para la violación de los principios, elementales y básicos, que establece nuestra Constitución, y demás leyes, en protección, *precisamente*, de esa ciudadanía. "El fin", después de todo, "no justifica los medios". Tampoco puede menospreciarse una "voz de protesta". Resulta procedente recordar, a esos efectos, las elocuentes palabras, expresadas en 1945, de Martin Niemoller:

"En Alemania, los nazis primero persiguieron a los comunistas, pero yo, como no era comunista, no protesté. Más tarde vinieron tras los judíos pero como yo no era judío, no protesté. Luego, comenzaron a perseguir a los miembros de las uniones obreras, mas como yo no estaba unionado, no protesté. Más adelante la persecución se tornó contra los católicos, pero siendo yo protestante, no tuve por qué protestar. Luego vinie-

ron por mí. Para entonces ya no había nadie que protestara por ninguno otro. Asegurémosnos de que tal cosa no vuelva a suceder".[9] (Énfasis en el original.)

## VI

*Lamentablemente* —y por más que quisiéramos que el Estado en el presente caso estuviera en posición de presentar *toda* la evidencia en contra de este, aparentemente, corrupto funcionario que ha desgraciado el cargo que ocupa— *no* podemos suscribir las erróneas posiciones asumidas por la mayoría de los integrantes del Tribunal en el presente caso. Es por ello que nos vemos *obligados* a disentir.

**— O —**

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton.

La opinión emitida hoy por una mayoría del Tribunal concluye que la Ley Núm. 36 de 19 de junio de 1987 (25 L.P.R.A. sec. 971 *et seq.*), que autoriza la grabación de conversaciones no telefónicas por agentes encubiertos o informantes durante la investigación del crimen organizado, es constitucional. Por considerar que esta opinión es contraria al espíritu y al texto de nuestra Constitución y que constituye un nefasto y peligroso precedente en nuestra historia constitucional, disentimos.

Ignorando tanto la arquitectura ideológica de nuestra Carta de Derechos como el alcance de su primera disposición, la opinión deja sin efecto la protección constitucional contra los registros irrazonables cuando el Estado utiliza como método investigativo la grabación de conversaciones que no sean telefónicas.

---

[9] *Pueblo v. Gastón, Vigo*, 139 D.P.R. 314, 315–316 (1995).

Las garantías contra los registros irrazonables y la protección contra los ataques a la vida privada o familiar consagradas en las Secs. 8 y 10 de nuestra Constitución, L.P.R.A., Tomo 1, reflejan la voluntad de todo un pueblo de proteger sus libertades más preciadas contra todos los gobiernos, independientemente del partido o del gobernador que esté en el poder. No debemos ceder a la tentación de relajar sus salvaguardas procesales ante el temor al crimen y el objetivo legítimo de dotar al Estado con instrumentos para combatirlo. La experiencia histórica revela que la destrucción de las libertades individuales ha ocurrido precisamente en épocas en que se debilitaron estas garantías en aras de proveerle a los gobiernos medios eficaces para atacar un mal común.

Al permitir que el Estado grabe conversaciones no telefónicas mediante un procedimiento que no cumple con las garantías de la Carta de Derechos, la mayoría permite que el Estado utilice un instrumento de represión tan peligroso como las carpetas y listas que este Tribunal recientemente declaró inconstitucional en *Noriega v. Gobernador*, 122 D.P.R. 650 (1988). En aquella ocasión cumplimos con nuestras responsabilidades históricas y constitucionales. Hoy decepcionamos a todas las personas que han confiado en que esta Curia siempre los protegerá contra los desmanes de los gobiernos.

I

El 23 de octubre de 1991, el Ministerio Público presentó unas denuncias contra Néstor L. Santiago Feliciano por los delitos de soborno agravado e infracción a la Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico (en adelante Ley Contra el Crimen Organizado). En particular, el Ministerio Público sostuvo que mientras Santiago Feliciano se desempeñaba

como Fiscal auxiliar en el Tribunal Superior de Ponce, éste recibió dinero a cambio de ejercer influencia para favorecer a unas personas que iban a ser procesadas criminalmente. También imputaron que él participó en una empresa criminal organizada. Una parte esencial de la prueba de cargo en estos casos consistió en la grabación de una conversación no telefónica entre el acusado y Adalberto Rosas Santapao, obtenida con el consentimiento y la cooperación de este último. La grabación se obtuvo mediante una orden judicial, en conformidad con la Sec. 6 de la Ley Núm. 36, *supra*, 25 L.P.R.A. sec. 971q.

Después de varios trámites procesales, el acusado solicitó que se decretara la inconstitucionalidad de las disposiciones de la Ley Contra el Crimen Organizado relacionadas con la grabación y custodia de conversaciones no telefónicas y que se excluyera la prueba obtenida a través de este medio. En una extensa resolución el Tribunal Superior decretó inconstitucional el Art. 18 de la Ley contra el Crimen Organizado, 25 L.P.R.A. sec. 971q, porque violaba la dignidad y el derecho a la intimidad de todo ciudadano. Por lo tanto, declaró con lugar la moción de supresión de evidencia y ordenó la exclusión de la prueba obtenida mediante estas grabaciones.

El Procurador General recurre ante esta Curia y sostiene que el Tribunal de Primera Instancia "erró gravemente ... al resolver que la Ley 36, al proveer para la autorización judicial de grabación de conversaciones no telefónicas, es inconstitucional por estar reñida con la dignidad del ser humano y el derecho a la intimidad". Petición de *certiorari*, pág. 23. Aduce que "el presente caso constituye un ejemplo diáfano del tipo de interés apremiante del Estado ante el cual el derecho a la intimidad del acusado debe ceder". Íd., pág. 18. Además, expone que la decisión priva al Estado "de un medio sumamente efectivo para aliviar el combate del crimen organizado en Puerto Rico, pre-

cisamente en una época en que la criminalidad es la preocupación más apremiante de los puertorriqueños". Íd., pág. 3.

La opinión del Tribunal acoge totalmente la posición del Procurador General sobre el alcance de la prohibición constitucional contra registros irrazonables. En vista de que la Ley Núm. 36, *supra*, constituye una grave violación de la dignidad de los puertorriqueños y de sus derechos a una vida y a un hogar privado, suscribimos este disenso.

## II

Conscientes de la historia constitucional de Estados Unidos y de otros países del mundo occidental, los miembros de la Convención Constituyente de nuestra Constitución proclamaron la inviolabilidad de la dignidad del ser humano y formularon unas protecciones a la intimidad y al hogar de las personas contra injerencias abusivas del Estado. Inspirada en la Declaración Universal de los Derechos del Hombre, con el espíritu reformista y liberal de la "generación del cuarenta", los miembros de la Convención Constituyente aprobaron una Constitución en que la Carta de Derechos, por su ubicación, contenido y alcance, predomina sobre las otras disposiciones. Por su importancia, la Convención Constituyente ubicó las diecinueve (19) secciones en el Art. II y en el Preámbulo de la Constitución, L.P.R.A., Tomo 1, afirmó la importancia de "asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos".

Entre esos derechos del individuo frente al Estado se destaca la protección contra todo tipo de detención personal y registros e incautaciones irrazonables de la Sec. 10, la cual dispone, en parte:

No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

No se interceptará la comunicación telefónica.

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada *en juramento o afirmación*, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. (Énfasis suplido.) Art. II, Sec. 10, Const. E.L.A., *supra*, ed. 1982, pág. 299.

En esencia, estas disposiciones tienen el propósito de que el Gobierno no interfiera con los ciudadanos y no viole sus vidas privadas o familiares, al vigilar sus movimientos o sus actuaciones. Las tres (3) secciones constituyen la base constitucional del derecho a la intimidad en Puerto Rico y "el reconocimiento expreso en la Constitución del Estado Libre Asociado de estos dos valores ... amplía sensiblemente el radio del equivalente de la Enmienda Cuarta en nuestra Constitución". *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979).

Las secciones mencionadas persiguen "proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión". *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984). Su ámbito incluye tanto el hogar como cualquier propiedad o lugar sobre la que nuestros ciudadanos tengan algún tipo de expectativa de intimidad. *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991). Lo crucial es determinar " 'si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete". *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983). Para garantizar que el Estado cumpla estrictamente con este mandato, en la Sec. 10, *supra*, se incorporó específicamente una cláusula de exclusión de la evidencia ilegalmente obtenida. Su efecto principal es disuasivo. Con esta cláusula se quiso desalentar de la manera más drástica posible la invasión de la intimidad y

evitar en lo posible la violación de la dignidad de los ciudadanos a consecuencia de los registros y allanamientos irrazonables:

> La razón más contundente por la cual se prohíbe el uso en los tribunales de evidencia incriminatoria contra una persona, si aquella es obtenida ilegalmente, es porque ello constituye un ataque grave a la dignidad del ser humano. ...
>
> . . . . . . . .
>
> Es porque se estima que la obtención ilegal de evidencia vulnera la preciada intimidad de la persona que el lenguaje de la Sec. 10 ... tiene un tenor tan absoluto. La prohibición a la admisión judicial de la evidencia procurada ilegalmente se expresó en términos tajantes precisamente para manifestar de modo palmario que ello es totalmente incompatible con la visión de la dignidad del ser humano que la Constitución consagra. *Toll y Sucn. Rivera Rojas v. Adorno Medina*, 130 D.P.R. 352, 374 (1992), opinión disidente del Juez Asociado Señor Fuster Berlingeri.

Para ofrecer una mayor garantía a los ciudadanos, la Sec. 10, *supra*, requiere que sea únicamente un magistrado quien expida la orden de registro cuando existe causa probable apoyada en un "juramento o afirmación". De esta manera se interpone la figura neutral del magistrado. Su función constitucional no debe hacerse impensadamente o con un automatismo judicial que constituya una abdicación de sus facultades, poniendo en peligro la seguridad y vida personal de los ciudadanos.

La orden judicial sólo puede expedirse cuando se cumplen dos (2) requisitos: (1) cuando exista causa probable y (2) cuando ella esté adecuadamente fundamentada en un juramento o una afirmación del declarante que exponga los hechos que sirven de base para su expedición. Este requisito constitucional tiene el propósito de obligar a la persona que alegadamente tiene conocimiento personal de los hechos a que haga su declaración bajo juramento y se exponga a perjurio en caso de declarar falsamente. Véase *Pueblo v. Rivera Rodríguez*, 123 D.P.R. 467 (1989). Éste desalienta y penaliza las declaraciones falsas y le provee al

magistrado un instrumento efectivo para obligar al declarante a exponer un cuadro real de los hechos conocidos.

El agente del orden público que solicita una orden de registro tiene que acudir ante el magistrado con una declaración jurada que exponga los hechos que justifiquen su expedición y estar disponible para contestar las preguntas del magistrado. *Pueblo v. Rivera Rodríguez*, supra. La declaración jurada debe ser completa, clara, detallada y libre de contradicciones. El juez que emite la orden tiene la obligación indelegable de examinar con rigurosidad la declaración jurada para verificar que exponga hechos que justifiquen esta intrusión en la vida de un ciudadano.

Por otro lado, la Sec. 10 de la Constitución, *supra*, exige que, en la orden de allanamiento, se nombre o se describa con particularidad la persona o el lugar que será registrado y las cosas o propiedad que se van a ocupar. De esta manera se reduce el grado de discreción que tienen los funcionarios del orden público al ejecutarla. Lo determinante es que dichos funcionarios no deben tener discreción para registrar algún lugar que no esté incluido en la orden judicial.

Por la importancia de los derechos que salvaguardan estas disposiciones, en *Pueblo v. Dolce*, 105 D.P.R. 422, 428 (1976), afirmamos que este Tribunal tiene la facultad para expandir la garantía contra registros y allanamientos ilegales más allá de los límites de la Cuarta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. Allí concluimos que aunque "[l]a forma de la Sec. 10 del Art. II de la Constitución de Puerto Rico ... es análoga a la de la Enmienda Cuarta ... el contenido es distinto ... y es natural que su interpretación se atenga ... a las realidades cambiantes de una y otra sociedad". *Pueblo v. Dolce*, supra, pág. 429.

Recientemente, en *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994), reiteramos esta facultad de interpretar ampliamente el alcance de la protección contra registros

irrazonables para extenderle a quienes viven en residenciales públicos la protección constitucional a los pasillos y otras áreas comunes de los edificios y reconocerles una expectativa de intimidad en esos lugares.

A tenor con este ordenamiento, es nuestra obligación garantizar la vigorosidad de la protección constitucional teniendo siempre presente la preeminencia de los derechos fundamentales y la dignidad de todos los seres humanos. Si bien debemos tomar en consideración la experiencia en Estados Unidos, no debemos adoptar con automatismo judicial los cambios doctrinales recientes del Tribunal Supremo federal que interpretan restrictivamente la protección contra los registros irrazonables.

### III

Contrario a nuestros pronunciamientos anteriores, la opinión del Tribunal en el caso de autos adopta en su totalidad la visión restrictiva y conservadora del Estado "de que una persona no tiene expectativa razonable de intimidad en relación con declaraciones incriminatorias que le hace a un tercero". Además, concluye que "[e]n Puerto Rico, como regla general, la expectativa de intimidad que un individuo pueda tener en circunstancias relacionadas directamente con la comisión de un acto criminal es *limitada*". (Énfasis en el original.) Opinión mayoritaria, pág. 390. A tenor con esta normativa, el Tribunal revoca la resolución recurrida y autoriza la evidencia excluida porque no "exist[e] una expectativa legítima o razonable de intimidad sobre el *contenido* de una conversación relacionada a la *comisión de un crimen*". (Énfasis en el original.) Íd., pág. 391.

La nueva doctrina de facto revoca nuestros pronunciamientos anteriores a los efectos de que "[l]a razonabilidad [de un registro] dependerá del balance entre el interés público y el derecho del ciudadano a su seguridad personal,

libre de interferencias arbitrarias por parte del Estado". *Pueblo en interés menor N.R.O.*, 136 D.P.R. 949 (1994). A partir de esta decisión, el criterio rector para determinar la razonabilidad de un registro será el contenido de la conversación y no si la persona albergaba alguna expectativa de intimidad sobre la conversación sostenida o el lugar en la cual se efectuó.

De igual manera, la validez de un allanamiento de un hogar dependería de la naturaleza de la actividad que se lleve a cabo en éste. En otras palabras, si se cometiese algún delito en el hogar, el dueño de éste no podría albergar una expectativa de intimidad y reclamar una protección constitucional contra un registro irrazonable.

De un plumazo la opinión del Tribunal deja sin vigor la protección de estas cláusulas constitucionales que fueron expresamente incluidas para evitar los registros ilegales y garantizar la inviolabilidad de la persona. Al amparo de la nueva doctrina, la validez del registro dependerá de si la evidencia obtenida revela la comisión de un crimen. Como bien señaló el Juez Asociado Señor Rebollo López en su opinión disidente en *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965, 995 (1992), "[a]trás, *y olvidada*, ha quedado la reiterada y sabia norma a los efectos de que el mero hecho de que un registro y allanamiento rinda frutos criminosos *nunca puede ser utilizado* como fundamento para convalidar la ilegalidad del registro y allanamiento efectuado". (Énfasis en el original.)

No olvidemos que uno de los propósitos de la regla de exclusión es disuadir a los funcionarios del orden público para que en su lucha contra el crimen utilicen procedimientos investigativos constitucionalmente aceptables. Si permitimos que los agentes del orden público utilicen cualquier evidencia incriminatoria en los procedimientos judiciales, independientemente del método utilizado para conseguirla, socavamos el efecto disuasivo de la regla sobre los procesos investigativos del Estado. Claramente, desligar la

aplicabilidad de la protección contra registros y allanamientos irrazonables de los procedimientos utilizados para la obtención de evidencia incriminatoria es totalmente incompatible con los propósitos de la protección constitucional.

Por otro lado, en contraste con la opinión del Tribunal, debe notarse que la doctrina norteamericana aplicable a estas controversias no está fundamentada en el contenido de la información obtenida. En Estados Unidos, el Tribunal Supremo federal ha permitido las grabaciones porque ha concluido que la Cuarta Enmienda no ofrece garantías contra la divulgación de la conversación por una de las partes y no porque el contenido sea de naturaleza criminal. Véanse: *United States v. Caceres*, 440 U.S. 741 (1979); *United States v. White*, 401 U.S. 745 (1971). Por ende, las decisiones sobre estos extremos del Tribunal Supremo federal no han modificado los criterios antes formulados para examinar si las personas tenían una expectativa de intimidad.

Tampoco se puede fundamentar la norma expuesta por la opinión en el precedente de *P.R. Tel. Co. v. Martínez*, supra. En este caso se dispuso que quien realizaba llamadas ilegales a otro teléfono renunciaba a su derecho constitucional a que no se le interceptara la comunicación telefónica. Una lectura de esta decisión revela que esta determinación se fundamentó en que existía una expectativa razonable de intimidad sobre la conversación telefónica. De lo contrario, no hubiese sido necesario decidir que la persona que realizaba las llamadas indeseables renunció a ese derecho. Véase S. Tió, *¿Es válido el proyecto de las grabaciones?*, 94 Rev. Der. Pur. 21 (1985).

Por último, la norma relativa a que la expectativa de intimidad depende del contenido de la conversación parte de la premisa de que los temas tratados en cualquier interlocución son fácilmente separables. Sin embargo, todos sabemos que, de ordinario, cualquier plática incluye diversos

temas. Por ende, si durante una investigación de actos delictivos se permite que el Estado grabe las conversaciones de una persona particular, lo más probable es que la cinta incluya tanto declaraciones constitucionalmente protegidas, como las que según la norma de este caso puedan ser grabadas.

Conscientes de que la grabación directa de una conversación no puede ser selectiva, la opinión mayoritaria implícitamente reconoce la falacia de su norma y acepta que existe el peligro de que en algunos casos "el método electrónico utilizado puede potencialmente grabar otras comunicaciones constitucionalmente protegidas ...". Opinión mayoritaria, pág. 394. En esos casos, aunque bajo la normativa expuesta por la opinión técnicamente no hay un registro cuando se graban conversaciones incriminatorias, el Tribunal se ve forzado a requerir una orden judicial y a exigir que el mecanismo de grabación utilizado debe estar razonablemente diseñado para proteger el derecho de intimidad de otras personas que puedan resultar incidentalmente afectadas. Íd.

En el caso de autos, esta nueva norma es totalmente inaplicable e innecesaria, pues la Ley Núm. 36, *supra*, expresamente requiere que el Secretario de Justicia obtenga una autorización judicial para la grabación de cualquier comunicación oral que no sea telefónica. 25 L.P.R.A. sec. 971q. Claramente la Asamblea Legislativa consideró que este tipo de grabación constituía un registro y requirió que el Secretario de Justicia obtuviera una orden judicial. En vista de que el propio estatuto dispone que hay que obtener una orden judicial, no era necesario establecer una nueva norma para excluir del ámbito del derecho a la intimidad las conversaciones sobre asuntos delictivos. Tampoco era aconsejable en buena metodología adjudicativa hacer una disquisición sobre las distintas modalidades de la expectativa de intimidad y limitar el alcance de la doctrina.

# IV

Sin embargo, aunque la Ley Núm. 36, *supra*, exige que se obtenga una orden judicial para grabar una conversación que no sea telefónica, el estatuto es inconstitucional porque permite que esta determinación se haga sin estar "apoyada en juramento o afirmación". En específico, la Ley Núm. 36, *supra*, no requiere que el Secretario de Justicia o el fiscal designado juramente la solicitud que se presente en el tribunal. Sólo dispone que la petición incluya una "relación de los hechos" no jurada, preparada por el Secretario de Justicia, que den "base a su determinación de motivo fundado de que la persona se dedica a, o participa en cualquier actividad del crimen organizado". 25 L.P.R.A. sec. 971q(d)(1).

La ley tampoco exige que el agente investigador, que solicita al Secretario de Justicia la orden de registro, comparezca ante el juez y esté disponible para ser interrogado por el magistrado. *Pueblo v. Rivera Rodríguez*, supra. Como éste no tiene que comparecer ante el tribunal, el juez que emite la orden no puede, de estimarlo procedente, interrogar al único funcionario del orden público con conocimiento de los hechos que justifican el registro solicitado. Como ninguno de los peticionarios tiene que jurar ante el tribunal la petición, tampoco están sujetos a una convicción por perjurio, de probarse que su petición está fundamentada en hechos que son falsos.

Sobre estos extremos concurrimos con lo expuesto por el Juez Asociado Señor Rebollo López en la parte II de su opinión disidente y en su voto particular en *Reglas del Tribunal Supremo*, 120 D.P.R. 126, 136 (1987):

> Si nuestra Constitución exige, para intervenir con nuestras residencias y personas, que el mandamiento judicial autorizando un registro de las mismas esté fundamentado, *a juicio del magistrado*, en "causa probable *apoyada en juramento o afirmación*", ... ¿no infringe la Ley Núm. 36 la transcrita Sec. 10

del Art. II de nuestra Constitución? (Énfasis suplido y en el original.)

En estas circunstancias, el tribunal de instancia correctamente determinó que el mecanismo establecido por la Ley Núm. 36, *supra*, tenía el propósito de evitar que el magistrado examinara al declarante, si así lo estimase necesario.

Aunque la opinión del Tribunal acepta que la Ley Núm. 36, *supra*, no cumple a cabalidad con estos requisitos, concluye que estas omisiones constituyen unas deficiencias que pueden ser subsanadas. Al clasificar estas omisiones como unas deficiencias subsanables, el Tribunal le resta importancia a éstas y sienta las bases para permitir que se subsanen mediante el Reglamento promulgado por el Secretario de Justicia. Este modo de corregir la omisión legislativa no toma en consideración que, de ordinario, la autoridad que promulga un reglamento pueda enmendarlo o derogarlo con relativa facilidad.

Sin embargo, aun con esta modificación, ni el estatuto ni el reglamento requieren que el agente comparezca personalmente ante el magistrado. La opinión del Tribunal procede entonces a corregir la omisión al enmendar judicialmente el estatuto para requerir "que la solicitud de la orden judicial para grabar deberá ser presentada personalmente por el agente declarante y deberá ser jurada por éste". (Énfasis suprimido.) Opinión mayoritaria, pág. 407. Al corregir este defecto constitucional, el Tribunal sustituye a la Asamblea Legislativa y desde este estrado apelativo procede a enmendar una legislación muy controversial aprobada en 1987 con la oposición de muchos sectores del país, incluyendo todos los partidos de minoría. Considerando la naturaleza de los derechos constitucionales afectados por este estatuto y los argumentos expuestos en su contra en el debate legislativo cuando se aprobó la ley, la prudencia aconseja que cualquier enmienda a ésta se haga a través del proceso legislativo y no desde esta Curia.

La opinión invoca como precedente principal la decisión en *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981). Dicha jurisprudencia es inaplicable al caso de autos. En *Milán Rodríguez v. Muñoz*, supra, este Tribunal encontró que el estatuto en cuestión era inconstitucional por subinclusión y procedió a extender los beneficios a la clase excluida. Sin embargo, en el caso de autos no hay ninguna clase excluida de unos beneficios. Todo lo contrario, en este caso el estatuto impugnado restringe unos derechos consagrados por nuestra Constitución.

Contrario a las normas de hermenéutica constitucional, la mayoría realmente actúa como una legislatura y se apropia de la facultad legislativa para enmendar las leyes y eliminar un grave defecto constitucional que tiene una ley. A tenor con esta nueva interpretación del Poder Judicial, este Tribunal se adjudica la facultad para enmendar cualquier ley y diseñar un remedio que corrija una grave deficiencia estatutaria de matiz constitucional. Nuestra actuación constituye una usurpación del Poder Legislativo, en violación del principio de separación de poderes de nuestra Constitución, y es un precedente peligrosísimo en la historia del derecho constitucional en Puerto Rico.

## V

Además de lo expuesto anteriormente, la Ley Núm. 36, *supra*, es inconstitucional porque autoriza al Secretario de Justicia a ordenar la grabación sin una orden judicial, en ciertas circunstancias extraordinarias. El Art. 18(c)(1) y (2) de la Ley Núm. 36, *supra*, 25 L.P.R.A. sec. 971q(c)(1) y (2), dispone que se puede obviar el requisito constitucional cuando no exista otro medio de obtener la comunicación particular; cuando la seguridad del investigador esté seriamente amenazada; cuando hayan sido infructuosas las gestiones para conseguir un juez para expedir la orden, o cuando no se cuenta con el tiempo necesario para gestionar

la autorización. Corresponde al Secretario de Justicia hacer una determinación de que existen circunstancias extraordinarias para hacer la grabación sin una intervención judicial.

Todas estas excepciones constituyen nuevas excepciones a la norma imperante de que se presume ilegal un registro sin una orden. Una lectura de cualquiera de estas excepciones revela con claridad que el Secretario de Justicia tiene una amplia discreción para invocarlas y autorizar la grabación de una conversación privada sin previamente obtener una orden judicial. En particular, la que más se presta a interpretaciones acomodaticias por el Ministerio Público es la que permite la grabación sin una orden judicial cuando las gestiones para localizar a un Juez Superior "hayan sido infructuosas". 25 L.P.R.A. sec. 971q(c)(1)(C). Como en muchas ocasiones la grabación tendrá que hacerse durante horas en que no se pueda localizar con facilidad a un Juez Superior, los agentes podrán fácilmente justificar el registro sin orden en la mayoría de los casos.

De esta manera, el estatuto permite que el Secretario de Justicia ejerza una función judicial de evaluar la petición de un investigador nombrado por él y lo autoriza a intervenir en la vida privada de un ciudadano mientras lleva a cabo una investigación también ordenada por él. Nos sorprende que este Tribunal convalida esta delegación indebida de un poder que constitucionalmente le corresponde a la Rama Judicial. Mediante estas excepciones, el estatuto faculta al Secretario a hacer la determinación de que existe causa probable para ordenar la grabación de las conversaciones sin que se cumpla con los requisitos de la Sec. 10 de nuestra Constitución, *supra*.

Independientemente de quién ocupe la posición de Secretario de Justicia y con qué cuidado ejerza este poder de grabar las conversaciones no telefónicas, es realmente preocupante que se le otorgue tanta facultad a un funcionario público para intervenir con la vida privada de todos

nosotros. El problema esencialmente radica en el poder tan amplio otorgado al Ministerio Público para utilizar un método tan represivo para llevar a cabo sus propias investigaciones. Vía excepciones, la ley sustituye la figura independiente del magistrado por la del funcionario que dirige la investigación que origina la petición y que tiene un interés especial en que ésta tenga resultados positivos que justifiquen su decisión original. No importa quién ocupe esa posición tan importante en nuestro ordenamiento, cometemos un gran error si lo colocamos en esta encrucijada tan peligrosa para los derechos humanos en el país.

A pesar de que estas disposiciones violan tanto el espíritu como la letra de la Sec. 10 y que ponen en peligro el derecho a la intimidad consagrado en la Sec. 8, *supra*, la opinión del Tribunal concluye que "[n]o tenemos aquí una medida que de su mera faz coarte o 'congele' derechos fundamentales ...". Opinión mayoritaria, pág. 419. De esta manera, la opinión evita evaluar la constitucionalidad de esta disposición que claramente afecta un derecho fundamental en nuestro ordenamiento constitucional. Su renuencia a pronunciarse sobre esta parte de la ley es contraria a la posición expuesta en otra parte de la opinión, en la que reafirma que la "Sec. 8 crea un derecho fundamental a la protección de la intimidad que cubre tanto la protección contra registros e incautaciones en el sentido material ... como la intrusión más abstracta a la vida privada y familiar del ciudadano". Íd., págs. 398–399.

Como creemos firmemente en los valores consagrados en la Constitución y nunca la hemos concebido como un mero instrumento de retórica, decretaríamos que, de su faz, la Ley Núm. 36, *supra*, es inconstitucional.

# VI

Sin embargo, y aun si aceptáramos la validez del remedio judicial formulado por la opinión mayoritaria, la Ley Núm. 36, *supra,* es inconstitucional por su incumplimiento con el requisito de especificidad exigido por el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra.* En específico, la referida ley es inconstitucional en cuanto establece que los tribunales podrán emitir órdenes que autoricen la grabación de comunicaciones por un período de hasta tres (3) meses. 25 L.P.R.A. sec. 971q(f).

El requisito de especificidad en la descripción del objeto que ha de ser incautado tiene, entre otros, el propósito de indicar al agente que diligencia la orden cuándo debe terminar su búsqueda. *LaFave and Israel, Criminal Procedure* 222 (1985). De esta manera se minimiza la intervención del Estado con la intimidad del individuo, pues, una vez incautado el objeto descrito, termina la intervención.

Según el profesor Chiesa Aponte, el requisito de especificidad, cuyo objetivo es "disminuir a casi nada la discreción de los funcionarios que han de diligenciar la orden", es de imperativo constitucional. Añade: "Lo decisivo es, en fin, la descripción de la persona o cosa con tal grado de particularidad que apenas se deje margen para lo que se quiere evitar: que se registre lo no autorizado." E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.10, págs. 351–353.

El incumplimiento con el requisito de especificidad fue uno de los fundamentos utilizados por el Tribunal Supremo federal en *Berger v. New York,* 388 U.S. 41 (1967), para declarar inconstitucional una ley de Nueva York que autorizaba la grabación de comunicaciones por agentes encubiertos por períodos de hasta sesenta (60) días, sujeta a la obtención de una orden judicial previa. Dicha ley fue declarada inconstitucional por violar la Cuarta Enmienda de la

Constitución federal, *supra.* El Tribunal determinó que las conversaciones estaban protegidas por la Cuarta Enmienda y que el uso de artefactos electrónicos para "incautarlas" era un registro protegido. Como fundamentos para invalidar la ley, dicho Foro federal señaló la inexistencia de un requisito de descripción específica de las conversaciones que han de ser "incautadas" y la falta de notificación a las personas cuya conversación fuera interceptada sin que se demostrara la existencia de circunstancias especiales que justificaran obviar tal notificación. Sobre el requisito de especificidad, el Tribunal expresó:

> ... The need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad on scope. *Berger v. New York,* supra, pág. 56.

El Tribunal Supremo federal enfatizó que la autorización para interceptar comunicaciones por un período de dos (2) meses equivalía a toda una serie de registros, fundamentada en una sola determinación de causa probable. Finalmente, dejó claro que su decisión no implicaba que ninguna ley, que autorizara la grabación de comunicaciones, podía ser válida constitucionalmente. Mencionó como ejemplo el caso *Osborn v. United States,* 385 U.S. 323 (1966), en el cual se permitió la grabación previa orden judicial en un caso en el que se alegó la comisión de un delito específico y se solicitó la grabación de una conversación particular a base de una descripción de lo que se discutiría.

Un año después de haber emitido *Berger v. New York,* supra, el Congreso norteamericano aprobó el *Omnibus Crime Control and Safe Streets Act of 1968,* 18 U.S.C. secs. 2510–2520, comúnmente conocido como el Título III. Dicha ley requiere la obtención previa de una orden judicial que autorice la interceptación de comunicaciones por agentes del Estado, *excepto en aquellos casos en los cuales alguna*

*de las partes en la conversación haya consentido a la interceptación.* 18 U.S.C. sec. 2511(2)(c). La orden judicial puede autorizar grabaciones hasta por treinta (30) días. La ley aplica a aquellos estados que hayan autorizado la interceptación de comunicaciones protegidas por el Título III.

Posteriormente, el Tribunal Supremo federal validó la excepción establecida en el Título III al resolver que una persona que equivocadamente confíe en otra, que resulta ser un informante de la policía o un agente encubierto, no tiene una expectativa razonable de intimidad protegida por la Cuarta Enmienda, por lo que no se requiere que el encubierto obtenga una orden judicial para grabar la conversación. *United States v. White,* supra.

Sin embargo, en vista de que en nuestro ordenamiento constitucional se reconoce expresamente el derecho a la intimidad de los ciudadanos, tanto la Ley Núm. 36, *supra,* como la opinión del Tribunal requieren que el Estado obtenga una orden judicial para grabar una conversación entre dos (2) personas, incluso en los casos en que una de ellas es un agente o confidente. Pero, no obstante lo anterior, esta orden está llamada a cumplir con los requisitos constitucionales de la Sec. 10, *supra,* pág. 299, "describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse". En la medida en que la Ley Núm. 36, *supra,* permite la interceptación de comunicaciones por períodos prolongados de tiempo (*extended electronic surveillance*), no cumple con el requisito de especificidad requerido por la Constitución de Puerto Rico.

Consideramos que la "factura más ancha" de nuestra Constitución y la consagración expresa del derecho a la intimidad en ésta requieren que este Tribunal declare inconstitucional la Ley Núm. 36, *supra,* en cuanto autoriza una grabación de comunicaciones por un período tan prolongado de tiempo. Ello se justifica, ya que este tipo de intervención con la intimidad de la persona es aún más

severa que el registro o la incautación de objetos materiales. En el caso de la grabación de comunicaciones no telefónicas por un período de hasta tres (3) meses, la duración de la intromisión en la intimidad es excesivamente prolongada y su terminación se deja prácticamente al arbitrio del agente o informante que graba la conversación que sea objeto de la incautación. Además, dicha intervención equivale a toda una serie de registros fundamentados en una sola determinación de causa probable. Véanse, además: R.W. Galloway, Jr., *The Uninvited Ear: The Fourth Amendment Ban on Electronic Searches*, 22 Santa Clara L. Rev. 993–1024 (1982); 1 *Carr' The Law of Electronic Surveillance* Sec. 2.5 (1994).

Por otro lado, otro problema que presenta esta ley y que obvia la opinión mayoritaria es la falta de notificación a la persona de la intervención del Estado. En el caso de los registros y de las incautaciones tradicionales, es decir, de objetos materiales, de lugares y de personas, la persona es consciente de la intervención del Estado, a diferencia del caso de la grabación de comunicaciones en el que la persona nunca se entera de la intervención del Estado con su intimidad. Ello es distinto de lo señalado por la opinión mayoritaria al efecto de que no es necesario que el Estado cumpla en todos los casos con el requisito de dar aviso *previo* antes del registro o allanamiento. Nos referimos a la necesidad de una notificación *después* de la grabación con el propósito de que la persona sea notificada de la intervención del Estado con su intimidad.([1]) Aunque la notificación no es un imperativo constitucional expreso, sí es parte fundamental de la protección contra registros y allanamientos irrazonables. Dicho requisito se ha reconocido a nivel estatutario en nuestra jurisdicción a través de la Regla 231 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, la cual re-

---

([1]) El Título III del *Omnibus Crime Control and Safe Streets Act of 1968* impone un requisito similar en los casos en que ninguna parte ha consentido a la grabación de la conversación. Las grabaciones de comunicaciones en que una parte ha consentido a la grabación no están protegidas por dicha ley.

quiere que el funcionario que diligencie una orden de allanamiento o registro le dé copia de la orden a la persona a quien se le ocupe la propiedad y entregue un recibo de la propiedad ocupada, o deje dicha copia y recibo en el lugar donde ocupó la propiedad.

En conclusión, la grabación de comunicaciones por períodos de hasta tres (3) meses viola el requisito constitucional de especificidad. Sólo una ley que cumpla con el requisito de especificidad se ajusta a las exigencias de la Sec. 10 de la Constitución, *supra*. Ello requeriría que la declaración jurada que da base a la determinación de causa probable contenga una descripción del asunto específico que se va a discutir y que la orden judicial sólo pueda autorizar la grabación de esa conversación en específico.

## VII

En resumen, la Ley Núm. 36, *supra*, es inconstitucional porque no exige que la orden judicial de grabación de las conversaciones esté fundamentada en un juramento o una afirmación del agente que la solicita y no requiere que él esté disponible para ser interrogado por el magistrado. Además, la ley autoriza este registro por un período excesivo de tiempo y no requiere que se especifique la conversación que se va a grabar. En fin, la ley es inconstitucional porque viola la intimidad y dignidad de las personas que estén sujetas a esa investigación tan represiva por parte del Estado.

La norma expuesta por la opinión mayoritaria obvia la cuestión medular de esta controversia: ¿queremos realmente, en nuestro sistema democrático, imponerle a nuestros ciudadanos el riesgo de grabar sus conversaciones privadas sin ni siquiera la protección de una orden que cumpla estrictamente con todos los requisitos de la Sec. 10 de nuestra Constitución? ¿Es éste el tipo de sociedad que queremos dejarle a nuestros hijos?

Si además tomamos en consideración que en nuestro país existe una desconfianza hacia el Estado por parte de ciertos sectores de la población y que en el pasado el Estado ha recurrido a métodos investigativos inconstitucionales para perseguir a personas por razones políticas, véase *Noriega v. Gobernador*, supra, la normativa expuesta en este caso por el Tribunal seguramente tendrá el efecto de inhibir o, por lo menos, limitar de forma sustancial las conversaciones entre los puertorriqueños, independientemente de si se trata de temas sociales, religiosos, económicos, familiares o políticos. No olvidemos que la preparación de carpetas y de listas fue realizada por el Estado sin una autorización expresa de la Asamblea Legislativa. Si el Estado llevó a cabo esa práctica inconstitucional sin una autorización legislativa, ¿hasta dónde serán capaces de llegar con una ley como la de autos?

Para concluir, nos parecen muy acertadas las palabras del Lcdo. Jaime Benítez, quien presidió la Comisión de la Carta de Derechos de la Convención Constituyente, sobre el efecto nocivo para el país de la Ley Núm. 36, *supra*:

A mí me duele, como puertorriqueño ... que después ... del crimen de Maravilla perpetrado por unos agentes encubiertos, ... que sostengamos ahora que por lo que hay que dar la gran pelea en Puerto Rico es para darle más fuerza todavía a los agentes encubiertos. No puedo ignorar que una de las debilidades tremendas de nuestra vida política que no hay que acentuar, es la desconfianza con los que ejercitan el poder. Este proyecto es uno nutrido de potencialidades de desconfianza a base de unas experiencias recientes. Sostengo finalmente que para levantar la calidad de vida colectiva, para reducir la criminalidad, para dar confianza, seguridad y participación al país e incorporarlo a la necesaria tarea de restablecer una ética pública mucho mayor, es menester desarrollar un amplio programa afirmativo. Actuamos por debajo de nuestra responsabilidad si nos limitamos a ir por las ramas y no atacamos las raíces del mal. J. Benítez, *Grabación de Conversaciones*, 94 Rev. Der. Pur. 15, 19 (1985).

Por las razones expresadas anteriormente, disentimos firmemente.